425 So.2d 734 (1983)
STATE of Louisiana
v.
Ronson Joe NOBLE.
No. 81-KA-2089.
Supreme Court of Louisiana.
January 10, 1983.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., William C. Pegues, III, Dist. Atty., for plaintiff-appellee.
C. Allen Bradley, David L. Wallace, Evans, Bradley & Wallace, DeRidder, for defendant-appellant.
MARCUS, Justice.
Ronson Joe Noble was indicted by the grand jury for second degree murder in violation of La.R.S. 14:30.1. At arraignment, defendant entered a plea of not guilty and not guilty by reason of insanity. After trial by jury, defendant was found guilty as charged and sentenced to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. On appeal, defendant relies on six assignments of error for reversal of his conviction and sentence.[1]

ASSIGNMENT OF ERROR NO. 1
Defendant contends the trial judge erred in allowing the state on redirect examination to introduce in evidence the shotgun used in the commission of the crime. He argues that he suffered prejudice as a result thereof.
On direct examination, Deputy Diane Childress testified that, after the body of the victim had been removed from the scene of the crime, she and another officer found a shotgun in a rack in one of the back bedrooms of the house. The gun was photographed in its original position, removed from the rack and taken to the police station. On cross-examination, defendant questioned Childress as to where she had observed the gun and if it was on the rack. He also questioned her about fingerprints on the gun. She replied that she had removed prints but they were only smudges. Prior to trial, the state and defendant had agreed that Childress could bring the gun into the courtroom. She held the gun in plain view of the jury during her entire *735 testimony. On redirect, the state asked the witness whether she had with her the gun taken from defendant's house. Defendant objected on the ground that the inquiry was beyond the scope of cross-examination. The trial judge overruled the objection. The gun was received in evidence and displayed to the jury. No further questions were asked by the state. Defendant was then permitted to recross the witness but chose to ask no questions with regard to the gun.
La.R.S. 15:281 provides:
The redirect examination must be confined to the subject matter of the cross-examination and to the explanation of statements elicited on cross-examination; but the application of this rule is within the discretion of the trial judge, provided that the opportunity be not denied to recross on the new matter brought out on the redirect. (Emphasis added.)
The state's inquiry and subsequent introduction in evidence of the shotgun on redirect examination would appear to be within the scope of defendant's cross-examination. In any event, we find no abuse of discretion by the trial judge. Defendant was permitted to recross-examine the witness as to the matter in question. Nor do we find that defendant suffered any prejudice. State v. Hathorn, 395 So.2d 783 (La.1981).
Assignment of Error No. 1 is without merit.

ASSIGNMENT OF ERROR NO. 3
Defendant contends the trial judge erred in denying his motion for a new trial on the ground that the state failed to introduce any evidence of specific intent, an essential element of the crime of second degree murder.
On review of the sufficiency of the evidence to support a criminal conviction, it must be determined whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Buxton, 416 So.2d 71 (La.1982). Our review of the record reveals the following facts.
On November 27, 1979, defendant left his home early in the morning. When he returned, his two sisters were seated in the living room watching television along with the victim, Donald Ray Monroe. Upon entering the house, defendant asked his sisters what they had cooked for the day. When they replied nothing, he appeared to be upset and "hostile." Defendant watched television for a short time, then went outside and ran around the house two or three times. Defendant repeated this act several times and then went into his parents' bedroom. He removed from a gun rack a shotgun which his father had unloaded prior to storage several months earlier. He then returned to the living room and shot and killed Monroe. Neither of defendant's sisters saw him actually shoot the victim. However, one of them testified that after the shooting she observed defendant holding the gun close to the victim's neck. Defendant returned to the bedroom and placed the shotgun back in the gun rack. After his sisters fled the house, defendant kicked out a window in the living room, left the house and rode his sister's bicycle to a neighborhood grocery store about seven blocks away. Speaking in a normal manner, he told the lady who ran the store, Mrs. Handy, that someone had been shot. He then sat down and smoked a cigarette. When asked, defendant told her that he had shot the victim. When asked why, he said, "I don't know." Mrs. Handy sent someone to find out what had happened. When she was informed that the victim was dead, she told defendant that the police were at his house and he should return home. Defendant went outside the store, smoked another cigarette, and then rode off on the bicycle. At no time did defendant request help for the victim. He was apprehended by the police several blocks away and was taken to the parish jail. He appeared to the officers as being calm and collected.
Defendant gave a statement to the police which can be summarized as follows: Defendant went into his parents' bedroom and *736 saw the gun. He took it off the rack and started "fooling around" with it. He broke the gun down and did not see anything in the barrel. He knew that the shells for the gun were located in a drawer by the bed, but he did not load the gun. He started walking toward the living room and was playing with the gun waving it around trying to scare the victim and the gun went off. He then returned to the bedroom and put the gun back on the rack. At this time he looked in the drawer and saw some shells. He stated that he had previously been looking in the drawer for a photo album. He told the victim he was going for help, kicked the living room window out and rode off on his bicycle to the store.
Second degree murder is the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm. La.R.S. 14:30.1(1). Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La.R.S. 14:10(1). Although intent is a question of fact, it need not be proven as a fact, it may be inferred from the circumstances of the transaction. La. R.S. 15:445.
In the instant case, defendant's sister testified that after the gun went off she looked up and defendant was holding the gun to the victim's neck. It can be inferred from the fact that defendant shot the victim in the head from close range that he actively desired his death to follow. State v. Boyer, 406 So.2d 143 (La.1981). Additionally, she testified that when defendant returned home and asked what they had cooked to eat he appeared to be upset and was hostile. Defendant's father testified that the gun was unloaded when he placed it on the gun rack several months before the shooting. The police discovered that the drawer where the shells were kept was open immediately after the shooting. Finally, defendant left the scene and went to a local grocery. At no time did he ever request help for the victim.
Viewing this evidence in the light most favorable to the prosecution, a rational trier of fact could have determined that defendant had the specific intent to kill or inflict great bodily harm. Hence, the trial judge did not err in denying defendant's motion for a new trial on this ground.
Assignment of Error No. 3 is without merit.

ASSIGNMENTS OF ERROR NOS. 4 AND 5
Defendant contends the trial judge erred in denying his motion for a new trial in finding that he failed to establish the defense of insanity by a preponderance of the evidence and in finding defendant guilty beyond a reasonable doubt.
At arraignment, defendant entered a plea of not guilty and not guilty by reason of insanity. Thereafter, pursuant to La.Code Crim.P. art. 644, a sanity commission was appointed by the trial judge to determine whether defendant had the mental capacity to proceed as well as his mental condition at the time of the offense. Upon receipt of the reports of the members of the commission, a contradictory hearing was held in which it was determined that defendant lacked the mental capacity to proceed.[2] The trial judge ordered defendant committed to the Feliciana Forensic Facility to receive treatment. He was subsequently returned to the parish jail six months later. He was re-examined by the sanity commission and at a later contradictory hearing, it was determined that defendant had the capacity to proceed to trial.
At trial, defendant elicited the testimony of three doctors, Drs. Keith Nabours and Etienne R. Brown of the original sanity commission, and Dr. David S. Post, a practicing clinical psychologist who administered tests to defendant the night before the trial. Additionally, defendant introduced *737 into evidence his medical records prior to the commission of the crime. All three of the doctors as well as defendant's medical records indicated that defendant was schizophrenic, either a paranoid or undifferentiated chronic type. The testimony was generally to the effect that schizophrenia is a psychotic disorder characteristically marked by a retreat from reality. While not curable, it gets better or worse from time to time. Remission, meaning a lessening of the symptoms, can be brought about with medication sometimes to a point "approaching a normal state." Dr. Brown noted that "about one percent of the population of the United States is schizophrenic or has schizophrenic tendencies but yet they are able to function." None of the doctors testified that defendant's mental condition at the time of the offense was such that he was incapable of distinguishing between right and wrong with reference to the conduct in question. Dr. Jiminez, a staff psychiatrist at the Feliciana Forensic Facility where defendant had been confined, testifying as a state rebuttal witness, stated that she had examined defendant while he was confined at the facility and as a member of a subsequent sanity commission. She diagnosed defendant as having a personality disorder of the antisocial type and that he was suffering from no major mental illness. She further testified that defendant did not suffer from any schizophrenic problem and that whatever action he does, he does it out of meanness and that he does not show any signs of being sorry for his actions.
A legal presumption exists that the defendant is sane and responsible for his actions. La.R.S. 15:432. The defendant has the burden of establishing the defense of insanity at the time of the offense by a preponderance of the evidence. La.Code Crim.P. art. 652. If the circumstances indicate that because of a mental disease or mental defect the offender was incapable of distinguishing between right and wrong with reference to the conduct in question, the offender shall be exempt from criminal responsibility. La.R.S. 14:14.
The evidence indicates that the defendant may have been ill both before and after the criminal act took place. However, defendant presented no evidence, neither lay nor professional, that he could not distinguish between right and wrong with reference to the shooting which took place, the standard for insanity in this state. On cross-examination, defense witness Dr. Nabours admitted that it was entirely possible that a person suffering from schizophrenia could distinguish right from wrong and that it would not be unusual for him to be able to do that. In addition to the expert testimony, the jury had the benefit of the lay testimony as to defendant's actions and attitude both before and after the crime.
Viewing the evidence in the light most favorable to the prosecution, we conclude that defendant did not establish the affirmative defense of insanity by a preponderance of the evidence, and we find that any rational trier of fact could have found defendant guilty beyond a reasonable doubt. Moore v. Duckworth, 443 U.S. 713, 99 S.Ct. 3088, 61 L.Ed.2d 865 (1979); Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Hathorn, 395 So.2d 783 (La.1981). Hence, the trial judge did not err in denying defendant's motion for a new trial on this ground.
Assignments of Error Nos. 4 and 5 are without merit.

DECREE
For the reasons assigned, the conviction and sentence are affirmed.
NOTES
[1] Defendant has expressly abandoned Assignments of Error Nos. 2 and 6.
[2] No finding was made by the commission as to defendant's mental condition at the time of the offense.