444 So.2d 287 (1983)
STATE of Louisiana
v.
John SHIELDS.
No. 83 KA 0677.
Court of Appeal of Louisiana, First Circuit.
December 22, 1983.
Writ Denied March 9, 1984.
*288 Ossie Brown, Dist. Atty. by Glen R. Petersen, Joseph N. Lotwick, Asst. Dist. Attys., Baton Rouge, for plaintiff-appellee.
Michele Fournet, Asst. Public Defender, Baton Rouge, for defendant-appellant.
Before SHORTESS, LANIER and CRAIN, JJ.
LANIER, Judge.
The defendant, John W. Shields, was charged with attempted second degree murder in violation of La.R.S. 14:27 and 30.1. Shields pled not guilty and not guilty by reason of insanity. After a trial by jury, he was found guilty as charged. Shields was sentenced to serve thirty-five years at hard labor in the custody of the Louisiana Department of Corrections.

FACTS
The victim in this case testified that on December 10, 1980, between 3:00 and 4:00 p.m., she was walking home on a residential street in East Baton Rouge Parish. The defendant, later identified as John W. Shields, drove up to her in a distinctively marked van and asked her to go riding with him. The victim had not previously known Shields. The victim accepted the ride and asked Shields to take her to a friend's house. Shields agreed but said that he wanted to go to the home of one of his friends to pay for some quaaludes he had purchased. Someone was at the home of Shields' friend, and he did not want to go in. Shields drove to a cul-de-sac dead end in a subdivision in the area and parked to await the visitor's departure. Shields and the victim talked while waiting. Suddenly Shields pulled the victim into the rear of the van and tied her hands behind her back with a rope. He then tore off her blouse and bra and pulled down her jeans and panties. He inserted his finger into her vagina. During this time, the victim was kicking and yelling. Shields opened the door of the van and kicked the victim *289 out. He then carried her to a nearby wooded area. He put her down and started dragging her by her hair. After they reached a small ditch, Shields wrapped the rope around the victim's neck and pulled on it until she lost consciousness. Shields thought she was dead and kicked her in the face several times with the heel of his boot. He then left. When the victim regained consciousness, she struggled free of the ropes and went to a nearby home for help. The victim was hospitalized for several days. She had a fractured cheekbone, cuts above her eye and on her lip, several teeth knocked loose and swollen eyes.
On December 21, 1980, Richard Crochet, a crime laboratory photographer who helped in the investigation of this incident, spotted a van that fit the description given by the victim. He called for assistance, and the van was stopped. The person driving the van, John W. Shields, fitted the description of the attacker given by the victim. Shields was then arrested.
Shields was interrogated by Detective Sergeant Daniel McAllister of the East Baton Rouge Sheriff's Office and Officer Royce Thompson of the Baton Rouge City Police. After being advised of his Miranda rights, Shields gave a voluntary statement. He said he met the victim at a McDonald's and offered her a ride home. She agreed to sell him some THC (tetrahydrocannabinol the active ingredient in marijuana) for $270. The victim left and returned with a sample. He gave her the money, and she left to get the drugs but did not return. He went looking for her and found her. They drove to the dead end street to wait for the drugs to arrive. The drugs never came. Shields became enraged and attacked the victim. From this point on, the oral confession of Shields was similar to the testimony of the victim.

DENIAL OF CONTINUANCE
Shields contends that his counsel was unable to adequately prepare his defense of not guilty by reason of insanity because the trial court refused to grant his motion for a continuance.
This case developed chronologically as follows:
December 10, 1980The offense was committed;
December 21, 1980Shields was arrested;
January 1981 (specific date unknown) Shields attempted suicide by hanging in jail;
January 28, 1981Court-appointed counsel for Shields filed motions for preliminary examination and bail reduction;
February 23, 1981Counsel for Shields filed motion for discovery;
February 25, 1981Sanity Commission appointed;
February 26, 1981Shields committed to the Feliciana Forensic Facility in Jackson, Louisiana;
October 13, 1981Bill of information for attempted second degree murder filed;
October 14, 1981Second Sanity Commission appointed;
October 16, 1981Shields ruled incapable of assisting counsel and ordered transferred back to the Feliciana Forensic Facility for treatment;
June 11, 1982Third Sanity Commission appointed;
August 16, 1982Sanity hearing held and Shields was determined able to assist in his defense. Shields was arraigned and pled not guilty;
August 31, 1982Shields notified that his trial would be January 3, 1983;
October 26, 1982Preliminary examination and bail reduction hearing were held. Trial court determined there was probable cause to hold Shields and refused to reduce the bail;
January 3, 1983Trial passed to January 4, 1983;
January 4, 1983Shields filed a motion for a continuance alleging that he wanted to change his plea to not guilty and not guilty by insanity and needed additional time to get additional psychiatric examinations to establish the defense of insanity. The trial court reassigned the trial to January 6, 1983. *290 Shields was examined for the first time by Dr. Marc Zimmerman, a clinical psychologist;
January 6, 1983Trial court denied motion for continuance. Shields changed his plea to not guilty and not guilty by reason of insanity. The trial was held on January 6 and 7, 1983. Dr. Marc Zimmerman testified as a defense witness and was of the opinion that Shields was unable to distinguish right from wrong at the time of the commission of the offense.
La.C.Cr.P. art. 707 provides as follows:
A motion for a continuance shall be in writing and shall allege specifically the grounds upon which it is based and, when made by a defendant, must be verified by his affidavit or that of his counsel. It shall be filed at least seven days prior to the commencement of trial. Upon written motion at any time and after contradictory hearing, the court may grant a continuance, but only upon a showing that such motion is in the interest of justice.
 (Emphasis added).
La.C.Cr.P. art. 712 provides as follows:
A motion for continuance, if timely filed, may be granted, in the discretion of the court, in any case if there is good ground therefor. (Emphasis added).
The jurisprudence interpreting Articles 707 and 712 holds that the granting or refusal of a motion for continuance rests within the sound discretion of the trial judge, and his ruling will not be disturbed on appeal absent a clear abuse of discretion. Whether a refusal to grant a continuance was justified depends primarily on the circumstances of the particular case. Convictions will not be reversed absent a showing of specific prejudice caused by the denial of a continuance. State v. Gaskin, 412 So.2d 1007 (La.1982).
The history of this case demonstrates that the possibility of an insanity defense was obvious from the beginning. In August of 1982, the defendant was advised that his trial would be in January of 1983. This is more than adequate notice that the defendant should be prepared to assert his defenses and participate in a trial. State v. Robicheaux, 412 So.2d 1313 (La.1982); State v. Champion, 412 So.2d 1048 (La.1982); State v. Willie, 410 So.2d 1019 (La.1982); State v. Barrios, 425 So.2d 980 (La.App. 5th Cir.1983).
Shields contends that the 1978 diagnosis of the mental hospital in Jackson, Louisiana, that he had an explosive personality disorder was not discovered until Dr. Zimmerman started a research into his history in January of 1983. He further contends that he did not have enough time before trial to locate the psychiatrist who rendered that diagnosis. Shields was committed to the Forensic Facility from February 26, 1981, to August 16, 1982. During this time, he was represented by counsel, and his records were available. The 1978 diagnosis of explosive personality disorder was presented to the jury through the testimony of Dr. Zimmerman. Shields did not submit a motion for a new trial alleging newly discovered evidence bearing on his insanity defense. It was within the defendant's capability to develop evidence on the insanity defense (if such existed) well in advance of the trial date. Considering all of the facts and circumstances of this case, we cannot say that the trial judge abused his discretion. See, for example, State v. Dupre, 408 So.2d 1229 (La.1982).
This assignment of error is without merit.

INSANITY DEFENSE
Shields contends that the evidence is insufficient to justify a rejection of his insanity defense and permit a finding of guilty.
The law applicable to the insanity defense is set forth in State v. Noble, 425 So.2d 734, 737 (La.1983) as follows:
A legal presumption exists that the defendant is sane and responsible for his actions. La.R.S. 15:432. The defendant has the burden of establishing the defense of insanity at the time of the offense by a preponderance of the evidence. *291 La.Code Crim.P. art. 652. If the circumstances indicate that because of a mental disease or mental defect the offender was incapable of distinguishing between right and wrong with reference to the conduct in question, the offender shall be exempt from criminal responsibility. La.R.S. 14:14.
The test to be followed when reviewing the sufficiency of the evidence on the defense of insanity is set forth in State v. Price, 403 So.2d 660, 662 (La.1981) as follows:
In reviewing such claims of insufficiency of evidence in regard to a defense of insanity, this court has applied the test established in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), in accord with the rule announced in Moore v. Duckworth, 443 U.S. 713, 99 S.Ct. 3088, 61 L.Ed.2d 865 (1979). See State v. Liner, 397 So.2d 506 (La.1981); State v. Hathorn, 395 So.2d 783 (La. 1981); State v. Claibon, 395 So.2d 770 (La.1981); State v. Roy, 395 So.2d 664 (La.1981). Under the Jackson standard, the test is whether a rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could conclude that the crime was proved beyond a reasonable doubt. When this standard is applied to the review of evidence adduced in support of the defense of insanity, which is the defendant's burden to prove, the question becomes whether any rational fact finder, viewing the evidence in the light most favorable to the prosecution, could find, beyond a reasonable doubt, that the defendant failed to present a preponderance of proof in support of the defense. That is, a defendant might fail to adduce any proof in support of the defense, or the prosecution might effectively rebut any evidence presented.
This test has been codified with the adoption of La.C.Cr.P. art. 821 by Act 144 of 1982. State v. Korman, 439 So.2d 1099 (La.App. 1st Cir.1983).
Shields presented the testimony of Dr. Zimmerman, Mrs. Betty Kalmbach (his mother) and himself on the insanity defense. Dr. Zimmerman is a Ph.D. in psychology specializing in personality disorders. He is licensed in Louisiana and Texas and is board certified. Dr. Zimmerman is not a physician or a psychiatrist. Dr. Zimmerman saw Shields for the first (and apparently only) time on January 4, 1983. He examined reports on Shields dating back to his commitment to Jackson in 1978. In 1978, Shields was diagnosed by a psychiatrist at Jackson as having an "explosive personality disorder". Dr. Zimmerman indicated that this mental defect is now known as an "intermittent explosive disorder". With such a defect, a person cannot control his behavior at certain times. During an episode of an "intermittent explosive disorder", a person cannot reason and thus cannot distinguish between right and wrong. Dr. Zimmerman was of the opinion that at the time of the offense Shields felt he was being "ripped off" by the victim, had an intermittent explosive disorder, lost total control of his conduct and could not tell right from wrong.
Mrs. Betty Kalmbach, the defendant's mother, testified that when he was eleven years old he was involved in an accident with an automobile while riding his minibike. Shields was knocked unconscious and was in a coma for ten days. Thereafter, he was in a wheelchair for almost a year. Mrs. Kalmbach said Shields had never been the same mentally since that accident. Mrs. Kalmbach testified that Shields was abused by his alcoholic stepfather and had destructive explosive episodes. Mrs. Kalmbach further testified that Shields was at her home after 5:00 p.m. on December 10, 1980, when she returned from work (the offense occurred between 3:00 and 4:00 p.m. on December 10, 1980). Shields was calm and acted alright. Shields helped his mother take some Christmas decorations out of a closet, and they set up the Christmas tree together. She could not tell if he was on drugs at that time.
Shields testified that he did not remember the incident, did not remember trying to hang himself in the jail and took drugs with his ex-girlfriend on occasion.
*292 The state presented the testimony of Dr. Landry and Officers McAllister and Thompson to rebut the defense of insanity. Dr. Landry testified that he was a physician and had been the coroner of East Baton Rouge Parish for the past eleven years. In the course of his duties, he examines between ten and twenty mental patients per day. Dr. Landry first saw Shields on December 30, 1980, at the request of his mother. Shields was aware of the charges against him but denied them. Dr. Landry was then of the opinion that Shields was probably in drug withdrawal but was not in acute distress. Shields did not have any mental or physical problems then which would require his removal from jail for treatment.
Dr. Landry next saw Shields on February 25, 1981. Dr. Landry was given a history (apparently from third persons) that approximately one month earlier Shields attempted to commit suicide by hanging in jail. When Shields was cut down, he had no vital signs (no blood pressure or breathing). Shields had been in the hospital since that incident and was released on the date of this examination to return to jail. Shields came to Landry's office in a wheelchair. He was poorly oriented, depressed and confused. Shields lost 25 pounds in the hospital, was weak and unable to walk. Shields was also suffering from bowel and bladder incompetence. Dr. Landry was of the opinion that Shields probably suffered some degree of brain impairment as a result of the suicide attempt and should be conveyed to an appropriate facility for therapy. Shields was admitted to the Feliciana Forensic Facility on February 26, 1981.
Dr. Landry next saw Shields on October 14, 1981. Shields had been released from the Forensic Facility on October 13, 1981. His condition was markedly improved, both physically and mentally. He could walk slowly and had bowel and bladder control. He had gained 35 pounds and was oriented as to time, place and current events. Shields denied knowledge of the charges and did not remember the hanging. Dr. Landry was then of the opinion that Shields would not be able to assist in his defense for several months.
Dr. Landry last saw Shields on July 30, 1982. Dr. Landry had learned that Shields had been struck by a car when he was an eleven year old, had trauma and had been in a coma. Dr. Landry gave the following testimony about that examination:
Today he is even more improved; being oriented to time and place and current events. He relates that he was in East Louisiana State Hospital in 1978 due to drug abuse. He used heroin for four years, and he was abusing drugs at the time of the alleged offense. He is able to give an account of his life but he denies knowledge of the alleged offense and states that he doesn't remember the hanging attempt. It was my opinion at that time that he understands the nature of the charges against him. He is able to assist counsel in his offense, and my impression was that he was probably sane at the time of the alleged offense except for whatever influence the drugs may have had upon him, which is pretty par for the course if you're under the influence.
Dr. Landry gave the following testimony relative to intermittent explosive disorder:
Q. Are you familiar with the intermittent explosive disorder?
A. Yes, Ma'am.
Q. Can you tell me some of the symptoms of itsome of the characteristics of it rather?
A. I don't know that it's necessary for me to comment on something that I'm notthat I don't think he's got. I don't know why you're asking me to comment on an intermittent explosive disorder. I mean I don't feel I'm nothaven't seen anybody with it. I think it's a far, unusual thing that you see, and I don't think it has any relevance to this case. I didn't diagnose that inhim as having that at all.

*293 Q. Are you aware that when he was in Jackson in 1978 he was diagnosed as having an explosive disorder?
A. No, Ma'am, I'm not.
Detective McAllister and Officer Royce Thompson testified they interrogated Shields after his arrest on December 21, 1980. Shields did not appear psychotic, delusional or insane, answered questions well and in detail, and had a good memory of the incident.
Also pertinent to the defense of insanity is the testimony of the victim. She indicated that Shields appeared normal, did not appear on drugs, did not take drugs in her presence and had no problem talking or driving the van.
The verdict indicates that the jury accepted the state's evidence on the issue of insanity and rejected that of the defendant. Viewing the evidence in the light most favorable to the prosecution shows beyond a reasonable doubt that Shields did not have the mental defect of intermittent explosive disorder, that he was sane and able to distinguish right from wrong at the time of the commission of the crime, and that he failed to prove by a preponderance of the evidence the affirmative defense of insanity. The evidence of record that he was a drug abuser and may have been in a drug-intoxicated condition is not pertinent to the insanity issue. State v. Brown, 421 So.2d 854 (La.1982); State v. Rives, 407 So.2d 1195 (La.1981).
This assignment of error is without merit.

EXCESSIVE SENTENCE
Shields contends that his sentence to serve thirty-five years at hard labor is excessive.
A majority of the Louisiana Supreme Court has held that Article I, Section 20 of the Louisiana Constitution of 1974 prohibits the imposition by law of excessive punishment. Although a sentence may be within statutory limits, it may violate a defendant's constitutional right against excessive punishment and is subject to appellate review. State v. Sepulvado, 367 So.2d 762 (La.1979). The trial judge is given a wide discretion in the imposition of sentences within statutory limits, and the sentence imposed by him should not be set aside as excessive in the absence of a manifest abuse of his discretion. State v. Prados, 404 So.2d 925 (La.1981); State v. Douglas, 389 So.2d 1263 (La.1980); State v. Spencer, 374 So.2d 1195 (La.1979). The authorized sentence for a defendant convicted of attempted second degree murder is imprisonment at hard labor for not more than fifty years. La.R.S. 14:27(D)(1); La. R.S. 14:30.1; State v. Cavazos, 422 So.2d 417 (La.1982).
The trial judge gave the following reasons for imposition of the sentence:
In pronouncing this sentence and in accordance with the provisions of Article 894.1 of the Louisiana Code of Criminal Procedure, the court cites that confinement is appropriate because there is an undue risk that during the period of a suspended sentence or probation the defendant would commit another crime and the defendant is in need of correctional treatment or a custodial environment that can be provided most effectively by his commitment to an institution, and the court cites that the subject has been arrested nine times as an adult since 1974 including the present offense. These arrests have resulted in two convictions for the charge of possession of marijuana for which he was sentenced to pay fines and two convictions for the charge of misdemeanor theft for which he was sentenced to pay fines and in one incident was placed on one year's supervised probation. The court will note that the subject's probation was terminated unsatisfactorily in that case. Also the defendant himself admits that since the age of eleven he has used quaaludes, preludin, blues and clears, speed, black mollies, heroin, acid and cocaine and further that he was addicted to the use of controlled dangerous substances. The subject has admitted to having prior drug dependency and was referred to the Baton Rouge *294 Mental Health Center for followup treatment after his release. Unfortunately the defendant did not follow up on the recommended treatment and chose instead to continue the use of drugs extensively. A lesser sentence would certainly deprecate the seriousness of the defendant's crime, and the court cites that this offense involved the defendant attacking his victim by choking her until she was unconscious. Then believing that she had beenthat she had died, kicked the defendant in the face; the court also noting that the defendant sexually molested the victim in this particular case.
Because of the heartless manner in which the offense was committed, the defendant's extensive record of unrepented drug abuse and the defendant's prior record of criminal activity, we cannot say that the sentence imposed by the trial judge is an abuse of discretion. See, for example, State v. Straughter, 406 So.2d 221 (La. 1981).
This assignment of error is without merit.

CONCLUSION
For the foregoing reasons, the defendant's conviction and sentence are affirmed.
AFFIRMED.