EDWIN A. LOMBARD, Judge.
| ?Tony Decloues appeals[1] his conviction and sentence for second degree murder. After review of the record in light of the applicable law and arguments of the parties, we affirm the defendant’s conviction and sentence.

Relevant Facts and Procedural History

On January 10, 2009, June Jones discovered the body of Louise Decloues in the bedroom of Ms. Decloues’ home at 1312 Cambronne Street. The seventy-four year old victim had been stabbed five times. Three of the stab wounds were to her upper chest, one was to her upper abdomen, and the last stab wound went *779 through her wrist. In addition, a plastic bag was tied over her head, causing her to asphyxiate. Upon observing the victim lying on the floor with a bag over her head, Ms. Jones ran from the house and called 911. Detective Randi Gant arrived at the scene, finding the defendant (who resided with his mother at 1312 Cambronne Street) in the backyard. He appeared agitated and tried to leave; he told the detective that he did not know what had happened to his mother and that he had been at the house of a friend, Pershing Matthews, since 2:00 p.m. on the previous day.
|3The defendant was transported to the homicide office, where he was met by Detective Anthony Pardo who read him his rights. The defendant signed a rights of arrestee form and indicated to the detective that he understood his rights. He initially told Detective Pardo that he was at Mr. Matthews’ house. However, after being confronted with the information that Mr. Matthews disputed this assertion, the defendant eventually confessed to stabbing and suffocating his mother. After taping his confession, the defendant showed the detective the dumpster on Dante Street where he had disposed of the murder weapon and the clothing he had worn during the murder. After obtaining a search warrant for the dumpster, the police retrieved a black gym bag, blue lock box, gloves, sweat shirt, sweat pants, a knife, and a small white bag containing newspaper. Everything recovered from the dumpster except the lock box had blood on it that was identified as human blood. No latent prints were found on the recovered knife, and no DNA testing was conducted on any of the evidence. In addition, two pairs of shoes found under the defendant’s bed on Cambronne Street also contained human blood.[2]
Meanwhile, shortly after the defendant was transported to the homicide office, Detective Ryan Aucoin arrived at Cam-bronne Street to conduct the on-scene investigation. He observed the body in the bedroom and blood on the bed. It appeared that the closet and dresser drawers had been rummaged through, a torn shoe box and black purse were on the floor, and crumpled newspaper containing blood was on a chair. Detective Aucoin spoke briefly with the defendant at University Hospital later that evening and found the defendant’s speech to be somewhat slurred.[3]
|4On April 9, 2009, the State charged the defendant with second degree murder. He pleaded not guilty on April 15, 2009. The court conducted a competency hearing on June 16, 2009. He was found competent to proceed to trial. After a hearing, the trial court denied the defendant’s motion to suppress the evidence and statement on July 21, 2009. The defendant was again found competent to proceed to trial and after trial on April 20, 2010, the defendant was found guilty as charged.
At the defendant’s trial, the State presented the testimony of Ms. Jones (who discovered the victim’s body), Doctor Paul McGarry (a forensic pathologist at the Coroner’s Office of Orleans Parish) and the police officers who investigated the crime, Detectives Gant, Pardo, and Aucoin. The defendant’s videotaped confession was played for the jury. Doctor McGarry testified that, had she received timely medical attention, the victim probably would not have died from the stab wounds and that *780 her demise was hastened by the plastic bag tied tightly over her head while she was still alive, causing her to asphyxiate. The doctor surmised that Ms. Decloues died from a combination of asphyxia and the stab wounds. Detective Pardo testified that he did not force, coerce or promise the defendant anything for his confession and, although the defendant stated he had smoked crack cocaine the day before, he did not appear intoxicated during the interview.
The defendant testified in his own defense as follows. At the time of the murder, he was fifty-five and had lived with his mother on Cambronne Street for ten years. They were not close due to his use of crack cocaine since his early twenties. He had five misdemeanor convictions for possession of drug paraphernalia. In January of 2009, he worked sporadically as an auto mechanic and |fidid other odd jobs. On January 7, 2009, he performed some work for a man renovating a house and was paid in cash. With that money, he bought crack cocaine and smoked it. At approximately 9:00 p.m., he returned home to his mother’s house. After showering and eating dinner, he went to his bedroom to watch television. As he was watching television, he started to have some pain in his leg.[4] After taking some Tylenol, he fell asleep until he was awoken suddenly by a nightmare at approximately 2:00 a.m. The gist of the nightmare was that he caught his “woman” in bed with another man. He remembered hitting her on the bed before pulling her to the floor. The defendant also remembered not wanting to look at her bloody face. He then went to the utility room and put the clothes that he was wearing into a black bag. Next thing he knew, he was at a dumpster. At that point he awoke from his dream, after which, he could not go back to sleep. He left the house and went to buy crack cocaine, which he smoked. He returned to the house around 6:30 a.m. on January 8, 2009 to get ready to go to work for Mr. Brown, the auto mechanic.
After he got off of work, he bought more crack cocaine. He and his friend Matthew smoked together until they ran out of crack cocaine and money. The defendant then pawned a saw that he took from the shed behind his mother’s house. With that money, he smoked more crack cocaine with Matthew. The defendant testified that he worked for Mr. Brown on January 9 and 10, 2009, and with the money he earned again bought and smoked crack cocaine.
He got off from work on January 10th at approximately 2:00 p.m. When he went to a convenience store to purchase cigarettes later that afternoon, he noticed |6an ambulance and fire truck further down the road near his mother’s house. Because his leg was bothering him, he called Mr. Brown for a ride. Approximately two hours later, Mr. Brown picked the defendant up and dropped him off at this mother’s house. The defendant ran into the house and towards his mother’s bedroom. He briefly caught a glimpse of her body lying on the floor.
The defendant stated that he had not had slept or eaten since January 7, 2009. He could remember his dream, but he had no recollection of doing anything to his mother or of anything about his statement to the police. He remembered going to the dumpster. He did not remember going to the hospital, but he did remember having his fingernails scraped. The defendant denied ever stealing anything from his mother.
*781 The jury found him guilty as charged on April 20, 2010. He was sentenced on April 26, 2010, to serve life imprisonment at hard labor. His motion for appeal was granted and his motion to reconsider sentence was denied.

Assignment of Error

By his sole assignment of error, the defendant argues that the trial court erred in denying his motion to suppress because he was impaired from days of drug use and sleep deprivation at the time he gave his statement.
Intoxication will render a confession inadmissible when the intoxication is of such a degree as to negate the defendant’s comprehension and render him unconscious of the consequences of what he is saying. State v. Simmons, 443 So.2d 512 (La.1983); State v. Robinson, 384 So.2d 332 (La.1980). Whether intoxication exists and is of a degree sufficient to vitiate the voluntariness of the confession are questions of fact and we will not overturn the trial judge’s conclusions on the credibility and weight of the testimony relating to the 17voluntariness of a confession unless they are not supported by the evidence. State v. Rankin, 357 So.2d 803 (La.1978); State v. Hutto, 349 So.2d 318 (La.1977).
The defendant argues that his demeanor during the taped confession and his testimony at trial clearly show that he was impaired at the time he gave his confession. The trial judge reviewed the taped confession during the motion hearing held on July 17, 2009, and, finding it marginal whether the confession was voluntary, continued the matter until July 21, 2009. When the court reconvened on that day, the State presented the testimony of Dr. Charles Vosburg, an expert in forensic psychology. Doctor Vosburg testified that he reviewed the tape of the defendant’s confession and, in his opinion, the poor concentration and disorganized thought exhibited by the defendant, along with the defendant’s hyperactivity, were due to drug abuse. He commented that the tape indicated someone who was coming down from drugs that were recently ingested. However, the defendant was easily calmed when he became upset, his concentration was easily restored, and there was no observable evidence of coercion. Moreover, the defendant spoke with clarity and with specificity during his confession. Accordingly, based upon these observations, Doctor Vosburg opined that the defendant knowingly waived his rights and that the statement was voluntary.
Our review of the taped confession indicates that at the beginning of the interview the detective read the defendant his rights. The defendant appears attentive while those rights were being read, acknowledging each one individually. When asked whether he understood his rights, the defendant gave a definitive yes. The defendant is noticeably fidgety and sometimes had to be asked to speak up, but as Doctor Vosburg observed, he was easily calmed. His answers were responsive to the questions asked by the detective. Significantly, the confession is detailed in |sthe description of how the murder occurred. The defendant explained that he had stayed out all night the night before and when he returned home, he and his mother argued. After retreating to his room to watch television and smoke more crack cocaine, he left the house again. When he returned, he thought he could slip into his mother’s room while she slept and take her credit card from her purse and a phone book that contained the pin number to the credit card. When he entered the room, she was awake and the defendant asked her for some Tylenol. He then went to the kitchen, retrieved a knife, returned to his mother’s room, and approached her. When his mother became vocal, he at *782 tacked her. The defendant admitted stabbing her, trying to break her neck, and suffocating her. He stated that the drugs made him deranged. He then explained how he removed all of his clothes and placed them in a black bag along with a glove and the knife that he wrapped in newspaper. The defendant placed the shoes that he was wearing under his bed. Afterwards, when he was looking for her purse, the defendant came across the lock box. He broke into the lock box and found thirty dollars. During the interview, the defendant expressed remorse for his actions.[5]
Moreover, the defendant’s confession coincides with the physical evidence presented at trial. The tape and testimony show that appellant was advised of and understood his rights. Doctor Vosburg’s observations of the defendant’s taped confession appear accurate. The district court viewed the taped confession and heard the testimony of Detective Pardo and Dr. Vos-burg before finding the confession to be voluntary. Because the confession is supported by the evidence, lawe do not find the trial court abused its discretion by denying the motions to suppress the statement and evidence.

Errors Patent

The transcript of the sentencing hearing shows that the defendant’s life sentence was imposed without benefit of probation, parole or suspension of sentence, and the minute entry of sentencing fails to reflect that the district court restricted parole eligibility as required by La.Rev.Stat. 14:30.1. The minute entry reflecting the illegally lenient sentence was sent to the Department of Corrections as evidence of the sentence imposed. However, pursuant to La.Rev.Stat. 15:301.1 A and State v. Williams, 2000-1725 (La.11/28/01), 800 So.2d 790, the sentence is deemed to have been imposed with the restriction of benefits, even in the absence of the minute entry showing the restrictions.

Conclusion

The defendant’s conviction and sentence are affirmed.
AFFIRMED.

. On February 1, 2011, the defendant filed a motion for leave and extension of time to file a pro se brief. The motion was granted on February 3, 2011, and the defendant was ordered to submit his brief within thirty days. That time period has expired and the court has not received the brief or a motion for extension of time.

. The shoes were found when a search warrant was executed at the house on January 11, 2009. Inexplicably, no DNA testing of the blood was done to discover if the blood on the defendant’s shoes was that of his mother.

. The defendant was at the hospital because a warrant to obtain blood and saliva samples was being executed.

. The defendant had broken his ankle in an earlier accident, and had also had knee replacement surgery that caused him to walk with a limp.

. The defendant was clearly aware of the implications of what he had done at the time of the murder as evidenced by his explanation that, before he left the house, he opened the drawers in the chests in their bedrooms to make it look like a burglary. He also noted that he threw the black bag in the dumpster because he realized the evidence inside the bag was incriminating.