EDWIN A. LOMBARD, Judge.
| ,On appeal, in her sole assignment of error, the defendant, Tiffany R. Byrd, argues that the evidence underlying her con *803 viction for attempted second degree murder is insufficient. After review of the record in light of the applicable law and arguments of the parties, we affirm the defendant’s conviction and sentence.

Relevant Procedural History

The defendant was charged by bill of information on December 6, 2010, with the attempted second degree murder of Carla Nelson, a violation of La.Rev.Stat. 14:(27)30.1. She pleaded not guilty. On April 11, 2011, the State filed a notice of intent to use in its opening statement the defendant’s inculpatory statement or confession to law enforcement officers. The trial court ruled that although the confession was inadmissible under La.Code Crim. Proc. art. 768, it was admissible as res gestae. The trial began on April 11, 2011, and the jury found the defendant guilty as charged the following day, April 12, 2012. On November 18, 2011, after denying the defendant’s motions for a new trial and for post-verdict judgment of acquittal, the trial court sentenced the defendant to seventeen years at hard labor, to run concurrently with any other sentence, with credit for time served.

_|aApplicable Law

La.Rev.Stat. 14:30.1 (A)(1) provides in pertinent part that second degree murder is the killing of a human being “[w]hen the offender has a specific intent to kill or to inflict great bodily harm.” In turn, La. Rev.Stat. 14:27 provides in pertinent part:
A. Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.
B. (1) Mere preparation to commit a crime shall not be sufficient to constitute an attempt; but lying in wait with a dangerous weapon with the intent to commit a crime, or searching for the intended victim with a dangerous weapon with the intent to commit a crime, shall be sufficient to constitute an attempt to commit the offense intended....
Accordingly, to obtain a conviction for attempted second degree murder, the State must prove that the defendant: (1) intended to kill the victim; and (2) committed an overt act tending toward the accomplishment of the victim’s death. State v. Bishop, 2001-2548, p. 4 (La.1/14/03), 835 So.2d 434, 437; see also State v. Huizar, 414 So.2d 741 (La.1982) (under La.Rev.Stat. 14:30.1, attempted second degree murder requires specific intent to kill). Specific intent “exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act,” La.Rev.Stat. 14:10(1), and may be inferred from the circumstances surrounding the offense and the conduct of the defendant. State v. Butler, 322 So.2d 189 (La.1975). Moreover, specific intent can be formed in an instant. State v. Sartain, 2008-0266, p. 27 (La.App. 4 Cir. 12/30/08), 2 So.3d 1132,1148; see also State v. Noble, 425 So.2d 734 (La.1983) (it can be inferred from fact that a defendant shot the victim in the head |3from close range that he actively desired that death would follow); State v. Johnson, 2008-1488, p. 10 (La. App. 4 Cir. 2/10/10), 33 So.3d 328, 334 (deliberately pointing a gun at the victim as it was fired is evidence of specific intent to kill).
With regard to self-defense, La. Rev.Stat. 14:19(A) provides in pertinent part that “[t]he use of force or violence upon the person of another is justifiable when committed for the purpose of pre *804 venting a forcible offense against the person ... provided that the force or violence used must be reasonable and apparently necessary to prevent such offense....” See also La.Rev.Stat. 14:20(A)(1) (homicide is justifiable “[w]hen committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger”). In homicide cases, when the defendant asserts that he acted in self-defense, the State has the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense. State v. Taylor, 2003-1834, p. 7 (La.5/25/04), 875 So.2d 58, 63. The State’s burden of proof is unclear in a non-homicide case, however, and may only require proof by a preponderance of the evidence. State v. Cooks, 2011-0342, p. 11 (La.App. 4 Cir. 12/14/11), 81 So.3d 932, 939: see also State v. Boudreaux, 2008-1504, p. 32 (La.App. 4 Cir. 9/29/10), 48 So.3d 1144, 1161-1162 (concluding burden had been met under either standard).

Standard of Review

The standard of review to determine the sufficiency of the evidence underlying a conviction is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Most notably, the fact finder’s decision concerning the credibility of a witness will not be disturbed unless it is clearly contrary to the evidence. State v. James, 2009-1188, p. 4 (La.App. 4 Cir. 2/24/10), 32 So.3d 993, 996. Specifically, “a reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence,” State v. Smith, 600 So.2d 1319, 1324 (La.1992), and the testimony of a single witness, if believed by the trier of fact, is sufficient to support a conviction. State v. Wells, 2010-1338, p. 5 (La.App. 4 Cir. 3/30/11), 64 So.3d 303, 306.

Relevant Facts

The following relevant evidence was adduced at trial. The State presented five witnesses: (1) Dr. Peter Meade, the trauma surgeon who treated the victim in the emergency room immediately after the shooting; (2) Mary Knight, the 911 operator who received the calls pertaining to the shooting; (3) Officer Raynell Johnson of the New Orleans Police Department (NOPD); (4) Ronikia Josey, the defendant’s domestic partner of four years; and (5) Carla Nelson, the victim. In response, the defense (1) recalled Ms. Josey; (2) presented the testimony of Cindy Lassai, the next door neighbor; and (3), the defendant testified on her own behalf.
Dr. Peter Meade, the general trauma surgeon at University Hospital and assistant clinical professor of surgery at LSU and Tulane Medical Schools on duty when the victim, Ms. Nelson, arrived at the emergency room November 6, 2010, testified that she had multiple gunshot wounds necessitating a three-hour exploratory surgery, as well as removal of portions of the victim’s intestinal tract and stopping the bleeding in her liver. Specifically, Ms. Nelson had thirteen potentially fatal wounds: one on the left chest; one in the abdomen or stomach area; two wounds in the left arm; two in the left leg; two in the right knee area; one pin the lower right leg; one in the left upper arm; one in the large intestine and another in the intestines; one in the liver. In addition, Ms. Nelson also had a laceration on the bridge of her nose. The medical records were admitted into evidence.
*805 Officer Johnson testified that November 6, 2010, his unit was dispatched to a reported aggravated battery by shooting. When he arrived in the vicinity of the reported shooting, he first saw a Nissan Titan truck in the driveway of 1874 Industry Street blocked by a black vehicle parked on an angle and the victim, bleeding from several parts of her body, on the porch next door at 1872 Industry Street. Officer Johnson immediately went over to the victim who indicated that the defendant, standing on her own porch at 1874 Industry, was the shooter. Accordingly, Officer Johnson walked over and handcuffed the defendant. The EMS arrived approximately ten minutes later to transport the victim to the hospital.
Officer Johnson observed several bullet holes in the driver’s side of the truck and the back window and driver’s side window had been shattered. He also looked inside the defendant’s house (1874 Industry) and observed “the handgun with the slide rack to the back, on a TV stand which is right there within the doorway.” The officer explained that when the “slide is back” on a semi-automatic handgun, it indicates that the gun has just been fired or is empty. He identified the handgun which was submitted into evidence. Officer Johnson also saw bullet casings at the scene which were subsequently collected when the crime lab processed the scene. Officer Johnson identified the gun as a Taurus .40 caliber handgun, stating that the casings were also .40 caliber casings.
On cross-examination, Officer Johnson conceded that there were mistakes in his report; specifically, he confused the names of the victim and the defendant, | firesulting in a report that indicated Ms. Josey said the victim, Ms. Nelson, rather than the defendant had a gun.
Ms. Josey testified that after a “big disagreement” with the defendant on November 1, 2010, she rented a car without the defendant’s knowledge and drove to Dallas to visit Ms. Nelson. When the rental car developed mechanical problems, she called her father in New Orleans for help and he, in turn, gave the defendant money to pick her up in Dallas. Ms. Nelson was with her when the defendant picked her up at a gas station in Piano, Texas. Subsequently, on November 5, 2010, Ms. Nelson flew in from Texas and Ms. Josey met her at the airport. They spent the night at a hotel and the next morning, under the misconception the defendant was not home, she returned home to change clothes before going to lunch. She parked the truck in the driveway and left Ms. Nelson in the vehicle while she went inside. She heard shots, ran out the front door, and saw Ms. Nelson bleeding. Ms. Josey was with Ms. Nelson on the neighbor’s porch (1872 Industry) when the police arrived but once the police officer handcuffed the defendant, she went to calm the defendant’s youngest son who was crying. As Ms. Josey entered the house she shared with Ms. Nelson, she saw the defendant’s gun on the book stand. According to Ms. Josey, the defendant always carried a gun because she had been raped and the house had been burglarized.
Ms. Nelson testified that in October 2010 she reconnected with Ms. Josey (who she had known when she lived in New Orleans) online. Ms. Josey indicated that she was having problems because her mother was very sick and when she asked if she could visit Dallas, Ms. Nelson agreed. Accordingly, Ms. Josey rented a car and drove to Dallas. However, the rental car was towed and Ms. Josey’s mother’s condition worsened, so the defendant drove to Dallas to take her back to |7New Orleans. Ms. Nelson flew into New Orleans on November 5, 2012, and stayed with Ms. Josey that night in a hotel. The *806 next morning, Ms. Nelson accompanied Ms. Josey to the home she shared with Ms. Nelson and waited in the truck, with the engine running, while Ms. Josey went inside to change.clothes. As she was talking to her daughter on the cell phone when “all of a sudden the passenger door opened” and before Ms. Nelson could turn, she was shot. According to Ms. Nelson, she had been sitting in the parked car for less than a minute when she was shot. Ms. Nelson identified the defendant as the shooter, who yelled: “ ‘B,’ get out the ‘f out the truck.” As she was wearing a seatbelt, Ms. Nelson could not immediately comply so the defendant kept shooting, telling her to “get the ‘f out the truck.” Ms. Nelson testified: “I said: give me a chance. If you don’t stop shooting me, you’re going to kill me. She said: “ ‘b’ that’s what I’m trying to do.” Ms. Nelson stated that during the first few shots, she “felt a burning sensation in my stomach.” She said that the second shot hit her knee, then her right ear; she said that she knew the appellant was not going to stop; she put her left arm up to “block my head.” Ms. Nelson showed the jury visible scars on her arm and under her armpit. She said that she used her right hand to try to unlock the seat belt, and she used her left arm to block the shots. She said: “[A]ll I can remember is I heard the clicking of the gun.” As she turned to try and get out of the vehicle, the defendant popped her in the face with the handle of the gun. Ms. Nelson said: “After she popped me, I grabbed for her. When I grabbed for her, she jecked [sic] back. My two fingernails popped off. And that’s how I was able to release myself from the seat belt.”
Ms. Nelson declared that she did not open the passenger’s door or threaten the defendant before the shooting and that she did not have a weapon with her. RThe defendant went inside her house and Ms. Nelson walked to the neighbor’s house to ask if she could stand on her porch and if she would call 911 for her. The lady said that she had already called. Ms. Nelson explained that the blood was running down her legs onto her wedge shoes and she was slipping, losing her balance. Ms. Josey ran out and “said; what the ‘f did you do. And she said; are you shot. I said, yes. She said how many times. I said; I don’t know.” The defendant told Ms. Josey “I did it for us.” Ms. Nelson said that the defendant was standing in the yard, but she had taken the gun inside. Ms. Nelson stated that the defendant said: “ ‘b’; that’s what you get for messing with a married man.” Ms. Nelson testified that she was shot nine times in one arm and has no feeling in that hand; she was shot twice in her left breast; four times in one leg; once in the ear; and she pointed to three other places on her body.
On cross-examination Ms. Nelson denied saying anything to the defendant except asking that she stop shooting her.
On redirect examination, Ms. Nelson stated that she saw the defendant once after the shooting and the defendant apologized. When Ms. Nelson asked her why she had shot her, the defendant replied that she did not want Ms. Josey to move on and that she was jealous.
Ms. Lassai testified that on November 6, 2010, she heard gunshots and called 911. Before the shots, however, she heard arguing and went to look. She saw the defendant and an unidentified person, who was sitting in the truck, arguing. The defendant was walking toward the truck door. Ms. Lassai testified: “The person in the— who was sitting in the truck told Tiffany [the defendant]; I got something for you. And she turned. And when she turned back is when Tiffany shot her.” The shots were fired within seconds.
*807 |nMs. Lassai conceded on cross-examination that, although it was more than one, she did not know how many gunshots were fired. When she was asked if it could have been less than three shots, she replied: ‘Tes.” Ms. Lassai testified she did not see the shooting because she was walking over to the coffee table to retrieve her phone. She had already called 911 when the victim asked her to do so. The State played the 911 tape and she identified her voice.
Ms. Josey, when called by the defense, stated that she stayed the night before trial at the defendant’s house, had never moved out of the defendant’s house, and still had a relationship with the defendant but that she flew back and forth to Dallas. On cross-examination, Ms. Josey testified that she did not hear what the defendant said to Ms. Nelson because she was in her closet changing her shirt.
The defendant testified that she had been in a relationship with Ms. Josey for four years. On the day of the incident, she parked in the driveway behind her Titan truck parked and walked toward the steps of her house. Because the truck had tinted windows, she could not see inside. The passenger door opened and Ms. Nelson stood up there and said: “Me and ‘Chew’ [Ms. Josey] just friends. But, bitch, it is what it is.” The defendant said that she then walked back toward the truck. The defendant testified:
I said; bitch, get out [sic] my truck. At that moment, she didn’t move. She was like — she still was saying something. I can’t remember what she was saying. And I’m like; get out my mother fucking truck. At that moment she stood up there and tried to swing on me.
When she swung, her hand got caught. Instead of her hitting me, her hands got caught right here on my shirt. She tore my shirt, broke her nails into my shirt. And at that point she sit [sic] up there. Her body was just like this (indicating). She turned in. But [sic] before she turned in, she said; bitch, I got something for you. Turned |inin. When she came back out this way, that’s when I started shooting. I carry my gun with me all the time.
The defendant conceded that the gun used in the shooting is registered in her name, explaining that she carries a gun because she was raped at sixteen and, because her house had been burglarized, she carried the gun back and forth to the car. The defendant stated that she found out about Ms. Nelson when she went to Dallas to pick up Ms. Josey. According to the defendant, she and Ms. Josey argued on November 1, 2010, resulting in her taking the keys to the Titan and Ms. Josey’s cell phone and telling her to leave if she was not happy. Subsequently, however, she drove to Texas to pick up Ms. Josey and the couple reconciled on the way home. On November 4, 2010, however, Ms. Nelson texted Ms. Josey numerous times and Ms. Josey called the defendant derogatory names. On November 5, 2010, Ms. Josey left the house and did not return that night. The defendant went out with her sister that night until five o’clock in the morning of November 6, 2010. When she returned home, she saw that Ms. Josey was not there. Ms. Josey called her at about 8:30 a.m. and they talked. The defendant testified that when Ms. Josey came home to change her shirt, she told her she better get her friend who had been shot in the truck and then went back outside and stood on her porch until the police arrived.
On cross-examination, the ADA asked if her she shot Ms. Nelson out of a sudden fit of rage or passion. The defendant said that she did not know. “I was just blinded. I was surprised she was there. I don’t know.” When the ADA asked if she *808 was “suddenly provoked,” the appellant replied: “Exactly.” She admitted that she shot Ms. Nelson, but she claimed that she was not sure if she shot Ms. Nelson twice. The defendant testified: “I had my finger on the trigger once. I |n don’t remember removing it.” She said that she was not familiar with the semi-automatic weapon because it was the first time she used it. She admitted that she carried it everywhere with her. The ADA said: “But you know nothing about it.” The defendant stated: • “Basically no.” The ADA said: “So you wouldn’t know that that’s a semiautomatic weapon and that you pulled that trigger 13 times.” The defendant said: “No, ma’am. I cannot tell you I know that.” The ADA stated: “And are you also telling the jury that you shot her because she said: I got something for you?” The defendant stated: “And I was afraid that she was about to shoot me.” When the ADA questioned whether she was scared when she confronted Ms. Nelson, the defendant testified:
I’m the one that was walking up to my door. She was the one that opened the door and tell me something. At that moment, yes; I was afraid. Because after telling me: bitch, I got something for you, my thought, my mind was [sic] my children. I didn’t know what she was gonna do. So my thing is it was either me or her. And for her to turn in and reach, I don’t know what she was going for. Honestly, tell you the truth, I don’t.

Discussion

The defendant asserts that there was insufficient evidence to support her conviction for attempted second degree murder because the shooting was in self-defense and, alternatively, the evidence supports only a verdict of attempted manslaughter. In essence, the defendant argues that her testimony was more credible than the victim’s uncorroborated testimony because Ms. Lassai’s testimony supports her (the defendant’s) version of events and, therefore, it was irrational for the jury to believe the victim. In addition, the defendant points out that she was justified in using force because she believed she was in imminent danger and it is unsettled whether the State had the burden to prove beyond a reasonable doubt that the appellant did not act in self-defense or whether the |12appellant had the burden of proving that she acted in self-defense by a preponderance of the evidence.
In response, the State argues that (1) it proved beyond a reasonable doubt that the defendant intended to kill the victim, Ms. Nelson, and took steps toward the accomplishment of that object; and (2) specific intent to kill can be inferred from the circumstances because the defendant shot the victim, Ms. Nelson, at least seven times (thirteen holes in her body) and continued to pull the trigger until she was out of ammunition. The State acknowledges that there is a conflict in testimony as to the facts surrounding the shooting, but points out that the jury made a credibility determination and there is sufficient evidence to find beyond a reasonable doubt that the appellant did not shoot in self-defense. Further, the State notes that the only testimony relating to self-defense was the defendant’s testimony which conflicted with the victim’s testimony and the number of shots fired by the defendant.
Viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty of attempted second degree murder beyond a reasonable doubt. The defendant admitted shooting Ms. Nelson and, as Officer Johnson testified, the semi-automatic weapon she used required that she pull the trigger each time she *809 shot in order to discharge another bullet. The victim testified that she told the defendant that she (the defendant) was going to kill her if she kept firing shots and the defendant responded that was what she was trying to do. The defendant shot Ms. Nelson multiple times at close range, resulting in substantial damage her liver, her intestinal tract, her chest, her ear, and her arms and legs; thus, based on the number of times the defendant fired the semi-automatic weapon, specific intent to kill can be inferred. Although Ms. Lassai’s ] lstestimony supported the defendant’s version of events, the jurors heard the conflicting testimony at trial and made their credibility determinations.
With regard to the defendant’s claim of self-defense, the evidence does not support a finding under either standard that the defendant was in imminent danger of losing her life or receiving great bodily harm and that killing Ms. Nelson was necessary to save her life. Moreover, the force used by the defendant, repeatedly shooting Ms. Nelson until the semi-automatic weapon was empty, was not reasonable and necessary to prevent the alleged offense against the defendant. Thus, under the facts of this case, the evidence was sufficient to negate the defendant’s claim of self-defense under either the proof beyond a reasonable doubt standard or the proof by a preponderance of the evidence standard. Based on the evidence presented at trial, it was not unreasonable for the jurors to decide that the State had proved that the defendant was guilty of attempted second-degree murder.
In the alternative, the defendant asserts that the verdict should be modified to attempted manslaughter. Although attempted manslaughter is a responsive verdict to attempted second degree murder, the defendant has not alleged the jury was improperly instructed. Moreover, the jurors heard the defendant’s testimony in response to the ADA’s question as to whether she shot Ms. Nelson in a sudden fit of rage: she first replied she did not know but then agreed with the ADA that she had been suddenly provoked by Ms. Nelson’s presence at her home. Accordingly, although the defendant’s testimony may have supported and attempted | ^manslaughter conviction[1] if the jury found the testimony credible, we find no basis upon which to modify the jury verdict.

Error Patent Review

A review of the record for errors patent reveals a sentencing error. The trial court sentenced the appellant, who was found guilty of attempted second degree murder, to seventeen years at hard labor. However, under La.Rev.Stat. 14:30.1, the sentence for second degree murder is life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. Under La.Rev. Stat. 14:27, a defendant convicted of attempted second degree murder shall be imprisoned at hard labor for not less than ten nor more than fifty years without benefit of parole, probation, or suspension of sentence. According to the November 18, 2011, sentencing transcript and the minute entry, however, the trial court did not include the restrictions that the seventeen-year sentence was to be served without benefit of parole, probation, or suspension of sentence as required and, therefore, the *810 sentence is illegally lenient. However, pursuant to La.Rev.Stat. 15:301.1(A), which is self-activating, and State v. Williams, 2000-1725 (La.11/28/01), 800 So.2d 790, the sentence is deemed to have been imposed with the restriction of benefits. See State v. Decloues, 2010-1247, p. 9 (La.App. 4 Cir. 3/23/11), 62 So.3d 778, 782, writ denied, 2011-0867 (La.2/3/12), 79 So.3d 1022. Thus, we need not correct the sentence or remand it to be corrected.
[ 1SConclusion
The defendant’s conviction and sentence are affirmed.
AFFIRMED

. La.Rev.Stat. 14:31(A) provides in pertinent par that manslaughter is a "homicide which would be murder ... but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection.”