JAMES F. McKAY III, Judge.
| STATEMENT OF THE CASE
The defendant, Travis Burke, was charged by grand jury indictment on August 26, 2009, with second degree murder, a violation of La. R.S. 14:3o.!.[1] The defendant pleaded not guilty at his September 1, 2009 arraignment. The defendant filed a motion to sever on June 4, 2010, which the trial court denied on July 7, 2010. The State subsequently tried the defendant *654 separately before a twelve-person jury on January 26-28, 2011, and he was found guilty as charged of second degree murder. On March 28, 2011, the defendant was sentenced to life imprisonment at hard labor, without benefit of parole, probation, or suspension of sentence.
FACTS
The defendant, Travis Burke, was convicted in the instant case for the May 22, 2009 second degree murder of Rodrick[2] Gordon.
[ 2Marguerite Crystaval, the victim’s mother, testified that the victim, “Roddy,” as she referred to him, was living with her on the Westbank at the time he was killed. He was then sixteen years old and in the ninth grade at L.B. Landry High School. On the day Rodrick was killed, he, along with Ms. Crystaval, her mother, and her youngest child, a daughter, went to the daughter’s kindergarten graduation. Afterward, Rodrick asked to go to his aunt’s residence for the weekend; she lived near the intersection of Carrollton and Earhart Avenues.
Ms. Crystaval testified that the last time she saw her son was that morning after the graduation, when her mother dropped her off at work. Rodrick was in the car. She identified a photograph of Rodrick and his younger sister, Christianne Crystaval. Ms. Crystaval confirmed on cross examination that her ex-husband, Benjamin Crys-taval, was a New Orleans Police Officer. He apparently was the victim’s father. She recalled the police detective who investigated the case from when she lived in a housing development, saying he was always the police officer in that area.
Rosaline Perkins, Rodrick Gordon’s grandmother, testified concerning the family going to Christianne Crystaval’s kindergarten graduation on the day Rodrick was killed. After the graduation they dropped Rodrick’s mother off at work at Harrah’s, at approximately 10:00 a.m. She said Rodrick and she came back to her home in Gretna, where Rodrick used to stay when his mother was at work. She then drove back across the river and dropped Rodrick off at a cousin’s home in the Iberville project. She later learned Rodrick had been killed, and she went to the scene in what she recalled as the 1400 or 1500 block of Conti Street.
New Orleans Police Department Officer Heidi Williams, assigned to the Crime Lab, testified that she worked the homicide scene in the 1500 block of Conti | -¡Street. She identified her crime scene report and a number of photographs taken at the scene. She also identified five Winchester 9mm Luger casings, six Wolf 9mm Luger casings, one FC 9mm Luger casing, one CCI 9mm Luger casing, five PPU Luger casings, nine Winchester .40 Smith and Wesson casings, one spent projectile, one copper jacket, one lead fragment, two copper fragments, and one spent bullet. Officer Williams confirmed that no weapons were recovered on the scene, nor was any physical evidence recovered that was attributable to any particular suspect, including the defendant.
A witness, who desired to be referred to at trial as K.G., testified that she had been living in the Iberville project for approximately fifteen years. She knew Rodrick and referred to him as “like family.” She was present the day he was murdered. K.G. testified that she was walking from *655 N. Robertson Street when she saw a white car and a black Trans Am pass through and come up the 1500 block of Conti Street. She testified that the defendant was in the white car with “Mall.[3]” She said the Trans Am had a few people she said she could not identify at the time, but later did. K.G. said she ducked behind a car on the side of a building. She observed the defendant and Mall exit the white car with two blaek guns “like a 9.... ” She heard fifteen shots and saw Rodrick fall to the ground with a bullet to the back of his head. She said he “crawled for his life.” K.G. testified that the shooters then stood over Rodrick and shot him a few more times before fleeing the scene. She said she was close enough to the defendant and Mall that she could identify the defendant with a tattoo on his forehead and a Seventh Ward “tear drop” on the side of his eyes.
14K.G. testified that she telephoned Detective Pratt approximately one hour later. Asked why she did so, K.G. replied: “Because I witnessed a murder. And it was wrong. And it’s got to be stopped.” She told Detective Pratt the names of the shooters and provided descriptions of the two vehicles involved. She met with Detective Pratt the following Monday, and he interviewed her. The next day she viewed two photo lineups and identified the suspects. She said she then “went in custody.[4]” The prosecutor asked why she went into custody, and she replied that she was not scared, that no one told her anything, but she did state she was in fear. When the prosecutor asked K.G. if she was aware of any feuding that was occurring in the neighborhood, she stated that it had been going for years with Sixth and Seventh Ward people beefing with “the Goo-nies,” who were in the Iberville project. She said Travis and Mall were affiliated with the Seventh Ward people. K.G. testified that, although Rodrick’s grandmother lived in the Iberville project and he was raised there, his family had moved. When asked if Rodrick was affiliated with any of the cliques, she replied that he did not even know them and was an innocent child in the wrong place at the wrong time. K.G. identified the defendant at trial.
On cross examination K.G. stated that the defendant had gone to Clark High School. She confirmed that to her recollection the murder occurred on June 8, not May 22. When asked how she knew the defendant, K.G. said he had been in the Iberville development several times and he had been at the home/homes of people she knew. She said she had known Rodrick’s mother and grandmother, and she had held Rodrick when he was a baby. K.G. testified that she had previously lived |sin the Iberville project. She denied having given Detective Pratt a height description for the defendant or that she had told Detective Pratt that one of the suspects had two tattoos on his face. She said she gave a recorded statement to police the same week as the shootings. However, when questioned by defense counsel some more about having given a recorded statement, she testified that Detective Pratt had told her he was going to record her statement.
On redirect examination K.G. confirmed that she recalled meeting with Detective Pratt and initialing the back of a photo with the defendant’s face on it. She was shown State Exhibit 7, and she said that was the identification she had made. She said it was dated May 26, 2009, at 8:86 p.m., and she had written on the back, “[sjhot and killed Rodrick.” She was *656 asked who that was, and she replied that it was the defendant. She confirmed that she knew all the youths connected to this case by their nicknames, by their full names, and by their photographs. She estimated she made the identification three days after the shooting took place. She said there was no doubt in her mind that the defendant was the person who killed Rodrick. She described “Mall,” who exited the white car with the defendant, each carrying a gun, as having thick dreadlocks and thick eyebrows.
New Orleans Police Department Officer Tyrone Martin, assigned to the Regional Transit Authority police, testified that he was in the transit lane at Canal and Rampart Streets when a call came out of a shooting in the Iberville project. He proceeded to that location up Canal Street to N. Claiborne Avenue and noticed a white vehicle driving a little faster than one would normally travel from “Iberville to Claiborne.” Officer Martin wrote down the license plate number of that vehicle just in case it might end up being part of the investigation, but opted to go the | (¡homicide scene instead of stopping the car. He said the driver of the vehicle had dreadlocks and appeared to have a little facial hair. He said he did not see dreadlocks on the second individual in the car, but other than that he did not get a good look at that individual.
New Orleans Police Department Detective Desmond Pratt testified that on May 22, 2009, he was assigned to the homicide division. He stated that he was assigned to the Iberville project for eleven years and was instrumental in implementing flag football and midnight basketball programs for youths in the project. He stated that one of his main objectives was knowing who the residents were who belonged in the Iberville project — so he could then know who did not belong there — estimating that ninety percent of the crime in housing project was perpetrated by nonresidents. He also became knowledgeable about neighborhood associations/gangs. Detective Pratt noted that there was a clique in the Iberville project called the “Goonie Boys,” some of whom, he said, would try to lure males from his football team to join the clique. He testified that he had a constant battle back and forth with the Goonie Boys. Detective Pratt also testified that the Lafitte project had the “WSG,” the Wild Side Gang, from the Sixth Ward, members whom had the number “6” tattooed on their foreheads. The detective said the Seventh Ward had the “PCB,” the Prieur and Columbus Boys.
Detective Pratt arrived at the homicide scene to find two other already officers there. Detective Pratt recognized the victim because he was on the detective’s flag football team. He said the victim was next to the sidewalk. He noted there were eighteen 9mm casings beginning in a rear driveway and leading into a courtyard. There were nine .40 caliber casings within a single grouping in the courtyard. Approximately an hour after the shooting Detective Pratt received a |7call from KG., who, he confirmed, was the witness who had just testified. He had known KG. for most of his eleven years working in the Iberville project.
Detective Pratt testified that KG. was crying hysterically. She gave him information about a white vehicle and a black vehicle, the latter one possibly being a Grand Am. K.G. gave him the nicknames of the Seventh Ward boys who had been in the white car and recited how the events transpired. He confirmed that after he spoke to KG. he had, in his mind, suspects in the case. He confirmed that one of those suspects was the defendant, Travis Burke. He met with K.G. approximately three days after the shooting and dis *657 played to her six photos, one of which she identified as the defendant. Detective Pratt testified that because K.G. already knew the perpetrators, he could have just shown her a photo of the defendant to confirm that, in fact, he was the person to whom she was referring. However, he said he opted to do a six-photo lineup instead.
Detective Pratt testified in detail about the evidence on the scene, referencing crime scene photographs. He confirmed that the spent cartridge casings were in clusters, and that the clusters were consistent with a trail of cartridges. Relative to this trail of spent cartridge, Detective Pratt affirmed that this was consistent with “a trail with a running battle.” Examination of the spent casings established that they had been fired by two different 9mm firearms and one .40 caliber firearm. No weapons were recovered at the defendant’s residence. The detective confirmed that the defendant turned himself in.
On cross examination defense counsel asked Detective Pratt to look at the photos in the six-person lineup he presented to KG. and to see if any of them had two tattoos on his face like the defendant had. Detective Pratt stated that the way the photos appeared you could not see any tattoos. It was confirmed that he had 18shown six individual photos to K.G. by placing them in an envelope and handing them to her. He confirmed that he did not put anything in his report about the defendant having a cross on his forehead and a number on his cheek. He said he did not put it in his report because it was already known that the defendant had the tattoos. K.G. told the detective that she knew the defendant through family members. The detective stated that the defendant’s rap sheet listed him as going to Clark High School, and he further testified that his sister-in-law was a teacher at that school and had seen the defendant at the Clark graduation the Wednesday before. The detective noted that members of the Seventh Ward PCB gang and members of the Sixth Ward gang had “a big shootout” at Franklin Avenue the previous Wednesday; an incident that he said led up to the shooting in which Rodrick was killed.
Detective Pratt confirmed that when the defendant turned himself in to police he gave Detective Pratt a statement. Detective Pratt said he did not record that statement because, in his opinion, the defendant was lying. Detective Pratt confirmed that he did not seize anything from the defendant related to the crime and recovered no evidence relating to the defendant.
On redirect examination Detective Pratt confirmed that K.G. not only identified the defendant, she identified four others. He further confirmed that when he initially spoke to K.G. an hour after the shooting she gave him the nicknames of those five individuals. Detective Pratt identified a one-page photo lineup in which KG. identified a photo of Jamal “Mall” Clay. At the time she made that identification she did not tell the detective anything different than she had told him in her first call on the day of the shooting. Detective Pratt confirmed |9that K.G. was put in witness protection to make sure she was safe from other members of the gang.
Della Burke, the defendant’s mother, testified as a witness for the defense. She lived at 3727 Willow Street at the time of the incident. She said that on the day of the shooting, May 22, 2009, she was preparing to deploy in the military on the following Monday. Her daughter Ariale Burke, age 26, was also home that day along with her son Travis and his baby son. Ms. Burke left her place of employment in Belle Chasse at approximately 4:05 p.m. and heard on her car radio, as *658 she was getting ready to cross the Mississippi River Bridge, about a shooting in the Iberville project. Ms. Burke testified that her son Travis never attended Clark High School, and that he stopped going to school in the ninth grade. She testified that the Iberville project would not have been an area in which he would have been found. She said that her son was raised in the Seventh Ward, had no affiliation with the Iberville project, and hung out in the Seventh Ward where he was raised. She said that when she heard he was named as having been in the Iberville project, she was “appalled” because that was “impossible.” Asked on direct examination where her son and some of his friends used to hang out, Ms. Burke replied: “Prieur and Columbus is where I would literally go and get him from because at a certain time, I knew where to find him.” She had heard of the individuals arrested along with the defendant, and she said she knew only one, Jamal Clay, with whom the defendant had attended junior high school.
Ms. Burke recalled when Detective Pratt came to 2638 O’Reilly Street, her grandmother’s address, with other officers. She was present, as was her daughter, defendant’s son (Ms. Burke’s grandson), and her grandmother, who was the legal resident of the premises. She said that her son, Travis Burke, did not live at that | inaddress. She confirmed to police that her son had a cell phone. She testified that on May 22, 2009, the defendant was back at her home with his son. Her daughter was there also. She stated she had no reason to lie, and that she had no doubt that her son had nothing to do with the homicide. She did not know K.G., the alleged eyewitness. Ms. Burke replied in the negative when asked whether the defendant would have had access to any kind of white car in which he would have been running around the city of New Orleans. She also replied in the negative when asked if the only friend she knew in connection with the group arrested, Jamal Clay, had access to any kind of white car in which he would have been running around the city.
Ms. Burke stated on cross examination that her son did not live at the O’Reilly Street address, and that on May 22, 2009, he lived with her at 3727 Willow Street. Police never served a search warrant at her residence. Ms. Burke stated that on the morning of May 22, 2009, she left her residence at approximately 7:30 a.m. She called home at approximately 1:30 p.m. to find out what her grandson was doing. She said her daughter telephoned her at 4:05 p.m., when she was on the bridge coming home, and “she explained to me that my son was still in the home.” Ms. Burke admitted that she did not know the defendant was. there, but that her daughter had no reason to lie. She denied that to keep the defendant from being prosecuted for a murder would have been a good reason for her daughter to lie.
Ms. Burke admitted that the defendant did not normally watch his son, who was then four months old, and that the baby’s mother was the caretaker. But, she said the defendant’s son had been dropped off with her the day before. She confirmed that her grandson was with the defendant all day, from the time she left | nfor work that morning. When asked if she would not be caught dead in the Iberville project, Ms. Burke replied, “[ejxactly.” She indicated that she felt this way because of the danger. Ms. Burke said the defendant used to live with his grandmother at 1541 N. Galvez Street, when she was living around the corner in the 1500 block of N. Miro Street. When asked if Jamal Clay was her son’s best friend, she replied that she did not know of him being a best friend. When the prosecutor immediately queried thereafter, “[a] good friend”, she *659 replied that she had seen them together, “that’s the best I can give you.”
Ms. Burke replied in the negative when asked on cross examination whether the defendant belonged to any gang. She was not aware of him having anything to do with guns. She was shown State Exhibit 11 which, she confirmed, was a photograph of the defendant holding a gun in each hand, along with another individual holding a sawed-off shotgun. She knew the defendant had tattoos, but, when asked if she knew the significance of the tattoos, she replied that she did not. When asked if she had ever inquired about the tattoo the defendant had on his forehead, she replied that she had not; when asked if she had ever inquired about the tattoo the defendant had of a number seven by his eye, she replied that she had not. She was not aware the defendant had a girlfriend in the Iberville project. When asked if it was her testimony that the defendant would never be caught dead in the Iberville project, she replied, “[n]ot Travis.”
Ariale Burke, the defendant’s sister, testified that on May 22, 2009, she, all of her brothers, and her mother were living uptown on Willow Street. When asked whether, on that particular day, she remembered being at the house with the defendant, she replied: “We were home all day, and his son also, who was four months at the time. We were inside from that morning to that night.” She replied |12in the negative when asked whether she would get on the witness stand and lie about that.
When asked on cross examination what the defendant did all day, Ariale replied that he tended to his child and watched television. She replied in the affirmative when asked whether her mother had called about 4:00 p.m. and talked to her. When the prosecutor noted that her mother had not said anything about talking to the defendant, only that she talked to her, Ariale, Ariale replied: “She talked to Travis also.” When asked if she remembered her mother talking to the defendant, Ariale replied: “Uh-huh.” When asked immediately thereafter: “Even though she does not say that,” Ariale replied: “She talked to Travis, also.” Ariale was firm in her belief that she learned of the murder in question on the news after 4:30 p.m. However, she also stated that when her mother called her, she asked her mother whether she had heard about the murder. Ariale replied in the affirmative when asked whether this meant that her mother called her after 4:30 p.m.
Ariale testified that from her understanding Jamal Clay was a good friend of the defendant. She identified a photograph of the defendant from his “My Space” Page. The picture shows him holding two guns, one in each hand. She had seen the second individual pictured in the photograph. She did not know if the defendant belonged to any neighborhood gangs or associations. She had never inquired about what the defendant’s tattoos meant nor did she talked to him about that. She did not know the defendant had a girlfriend in the Iberville project, but replied in the negative when asked whether she would not be astounded if the prosecutor told her that was true. Ariale remembered that, at the time the search warrant was being served, police asked her mother who she was, who the defendant was, and if her mother knew where the defendant was. Ariale did not | .¡remember Detective Pratt asking her mother whether the defendant had a cell phone so he could contact him.
Travis Burke took the witness stand and testified. He replied in the negative when asked if he had been “present in the project involved in the shooting of this young man” He said he was at home all day *660 watching his son uptown on Willow Street. When asked how it was that he never left the residence at all, the defendant stated that he had constantly asked his sister to watch his son, but she did not want to do it; “[s]o I had to stay.” The defendant said he had plans to eat with his mother and his son that night, because she was deploying overseas for a year. The defendant did not know what Detective Pratt was talking about when the detective said the defendant had been at a Clark High School graduation several days before the shooting. He said he knew for a fact that Detective Pratt did not know him. He said he never played park football at all. He said he had never set foot in the Iber-ville project, and that no female back there could ever tell anyone that he had talked to her. He said he had never worn braids, dreadlocks, or a bush in his life, and that he had always had a low haircut. He said he was about five feet seven inches tall. He did not know any of the other individuals he was arrested with in the case except Jamal Clay, with whom he grew up.
The defendant confirmed that he gave Detective Pratt a statement after he was arrested and that he would have had no problem -with Detective Pratt recording it. He told the detective he was watching his son all day and gave the detective his sister’s name. The defendant said he had never laid eyes on K.G. in his life. He did not know the victim. He did not know “Tweet” and “Preacher,” whom defense counsel referred to as the intended targets, and he said they had never done anything to him.
| uThe defendant replied in the negative on cross examination when asked whether he belonged to a gun club. The defendant did not recall what time he got up on May 22, 2009. He said his son had been dropped off the day before, and he confirmed that his plans were to stay home all day with his son. The defendant replied in the affirmative when asked whether he remembered testifying on direct examination that he had to stay home because he asked his sister to babysit and she had said no. He maintained that he had planned to stay there all day. He said he and his son watched television all day. He also said he talked to his mother that day when she called his sister at home. He first learned of the shooting on the local television news, seeing a news flash about a man being killed in the Iberville project, “more at five,” then seeing it on the news a couple of minutes later. He confirmed that his sister probably saw it on the news the same time as he had.
The defendant confirmed that he had seen Detective Pratt’s police report and that it stated that he had told the detective he was home all day watching his son, along with his sister, until his friend, Jamal Clay, picked him up at around 6:30 p.m. and they went riding. However, he confirmed that he did not tell Detective Pratt about Jamal Clay picking him up. The defendant confirmed that he had a cell phone.
The defendant acknowledged that Jamal Clay was a friend. The defendant recognized two photos in State Exhibit 10 that he admitted posting on his My Space page. He and Jamal were depicted in the exhibit. He confirmed that Jamal was holding a gun in his hand. The defendant identified another photo from his My Space page showing him holding two handguns. He replied in the negative when asked whether those two guns belonged to him. The defendant identified State Exhibit 12 as a photograph of him making a sign with his hands (seven | ^fingers) that meant “Seventh Ward,” the area where he grew up. He denied that it was a gang sign. He also confirmed that he had a tattoo of a seven under his eye, which, he said, meant *661 the same thing — the area in which he grew up. He also had a tattoo between his eyes, but replied “nothing” when asked what that was about. He said Jamal Clay did not have a “seven” tattoo under his eye. When asked whether Jamal Clay had a girlfriend in the Iberville project, the defendant replied that he was familiar with that fact. The defendant said he did not have a girlfriend in the Iberville project.
The defendant said he did not have any guns at all, “period.” When questioned that he “certainly” had guns on him occasionally, he replied that the photo of him with the two guns “was an image ... that’s all it was.” He said he was not a violent person at all. He subsequently stated that after the photo was taken he did not have anything to do with the guns. When asked what image he was projecting in the photo, the defendant said “[wjhatever people get out it.” The defendant stated that he, his sister, his son and his mother never went out to dinner as originally planned, but he could not recall why not.
The defendant replied in the negative on redirect examination when asked whether he committed a murder instead of going to dinner. He replied in the negative when asked whether the My Space photos, which defense counsel characterized as having been taken three years previously, had anything to do with the murder case. The defendant replied “[n]o” to questions whether he committed the murder; had a motive to commit it; had an opportunity to commit it; or had any doubt that he did not commit it.
Detective Pratt testified on rebuttal that he took a statement from the defendant six days after the killing, before he completed his May 28, 2009 report, |1fiand that the defendant related to him that he babysat all day at his mother’s residence, but that Jamal Clay picked him up at approximately 6:80 p.m. and they just went riding. The defendant told the officer he did not recall what kind of car Jamal was in. The detective stated that after answering these questions about Jamal, the defendant stopped answering questions. Detective Pratt testified that he had seen the defendant and Jamal Clay in the Iberville project on several occasions. He stated that they would visit a girl nicknamed “Big Mama,” who dated the defendant on the side.
Detective Pratt said he did not have his notes from the unrecorded interview with the defendant. He stated that there is no protocol for notes taken in connection with a homicide investigation, but that such notes did not go into the case file. On redirect examination Detective Pratt read the one-sentence summation of the defendant’s statement to him — “Travis Burke related he was by his mother’s house all day long. He was watching his son, along with his sister, until a friend, Jamal Clay, picked him up at about 6:30 p.m. and they went riding.”
PATENT ERRORS
A review of the record reveals no errors patent on the face of the record.
ASSIGNMENT OF ERROR NO. 1
In his first assignment of error, the defendant argues that the evidence was insufficient to support his conviction.
This Court set forth the applicable standard of review for sufficiency of the evidence in State v. Huckaby, 2000-1082, p. 32 (La.App. 4 Cir. 2/6/02), 809 So.2d 1093, 1111, as follows:
In evaluating whether evidence is constitutionally sufficient to support a conviction, an appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of h7fact could have found the defendant guilty beyond *662 a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Green, 588 So.2d 757 (La.App. 4 Cir.1991). However, the reviewing court may not disregard this duty simply because the record contains evidence that tends to support each fact necessary to constitute the crime. State v. Mussall, 523 So.2d 1305 (La.1988). The reviewing court must consider the record as a whole since that is what a rational trier of fact would-do. If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier’s view of all the evidence most favorable to the prosecution must be adopted. The fact finder’s discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. Mussall; Green; supra. “[A] reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence.” State v. Smith, 600 So.2d 1319 (La.1992) at 1324.
In addition, when circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Shapiro, 431 So.2d 372 (La.1982). The elements must be proven such that every reasonable hypothesis of innocence is excluded. La. R.S. 15:438. This is not a separate test from Jackson v. Virginia, supra, but rather an evidentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt. State v. Wright, 445 So.2d 1198 (La.1984). All evidence, direct and circumstantial, must meet the Jackson reasonable doubt standard. State v. Jacobs, 504 So.2d 817 (La.1987).
When the key issue is the defendant’s identity as the perpetrator, rather than whether the crime was committed, the State is required to negate any reasonable probability of misidentification. State v. Weary, 2003-3067, p. 18 (La.4/24/06), 931 So.2d 297, 311; State v. Neal, 2000-0674, p. 11 (La.6/29/01), 796 So.2d 649, 658.
The- testimony of a single witness, if believed by the trier of fact, is sufficient to support a conviction. State v. Wells, 2010-1338, p. 5 (La.App. 4 Cir. 3/30/11), 64 So.3d 303, 306. A factfinder’s decision concerning the credibility of a witness will not be disturbed unless it is clearly contrary to the evidence. State v. James, 2009-1188, p. 4 (La.App. 4 Cir. 2/24/10), 32 So.3d 993, 996.
11sThe defendant was convicted of second degree murder, a violation of La. R.S. 14:30.1. Conviction for second degree murder requires, inter alia, proof beyond a reasonable doubt that the perpetrator killed the victim while having the specific intent to kill him or inflict great bodily harm upon him. La. R.S. 14:30.1(A)(1); State v. Kirk, 2011-1218, p. 3 (La.App. 4 Cir. 8/8/12), 98 So.3d 934, 939.
The defendant argues that the only evidence linking defendant to the scene of the crime was “one very unreliable eyewitness who described the Travis’ she knew as the one who went to Clark High School, with dreadlocks and tattoos on his face.” The defendant claims she also described him as being six foot one inch tall. The defendant concedes that the only thing he and the perpetrator had in common were tattoos on the face. The presence of a tattoo on one’s forehead and another next to one’s eye is not an insignificant identifying feature.
K.G. testified that the defendant and the person she knew as “Mall,” the nickname *663 of the defendant’s friend, Jamal Clay, were affiliated with the Seventh Ward. K.G. also testified that Sixth and Seventh Ward people had been feuding with “the Goo-nies,” people connected to the Iberville project, for years. The victim grew up in the Iberville project and, at the time he was killed, had a grandmother who still resided there. K.G. had resided in the Iberville project for fifteen years. She named the defendant and “Mall” in a telephone call to New Orleans Police Department Detective Desmond Pratt as the shooters approximately one hour after the killing. K.G. testified that she saw the defendant and “Mall” both shoot at the victim, who then fell to the ground with a gunshot wound to the back of his head. She then observed them stand over Rodrick and shoot him 11 ¡,several more times. She later selected the defendant’s photo from a group of six photographs presented to her by Detective Pratt.
K.G. maintained during her cross examination that she did not give Detective Pratt a height description of the defendant. Detective Pratt testified that he recalled estimating a height based on him talking to K.G. in person, as she was sitting down, and asking her to estimate the defendant’s height compared to the detective. Detective Pratt made the height estimate, not K.G. Thus, the defendant is incorrect in stating that K.G. described him as being six foot one inch tall. The defendant is correct that K.G. testified at one point on cross examination — when being questioned about her supposedly telling Detective Pratt that the defendant was six foot one inch tall — that she told the detective “how he looked. He had dreads. Gave a description of his face and what he had, the tattoos and everything. I think that was enough.” Jamal “Mall” Clay had dreadlocks, not the defendant. K.G. obviously got the hairstyles of the two men momentarily mixed up when testifying on cross examination. K.G. identified a photograph of the defendant in a photo lineup, which photo showed the defendant wearing a “low” haircut, as he described it, and K.G. correctly testified on redirect examination that “Mall” had dreadlocks.
Contravene to KG.’s testimony on cross examination that the defendant went to Clark High School; his family testified that he had not gone to Clark. Detective Pratt testified that the defendant’s rap sheet reflected that he had gone to Clark. Detective Pratt also testified (without any defense objection) that his sister, a teacher at Clark, had seen the defendant at Clark’s graduation ceremony the Wednesday before the killing. Further, the detective noted that members of the Seventh Ward “PCB” gang and members of the Sixth Ward gang had “a big Rpshootout” at Franklin Avenue that Wednesday, an incident he said led up to the shooting in which Rodrick was killed. Also, Detective Pratt testified that the acronym of the Seventh Ward “PCB” gang stood for the “Prieur and Columbus Boys.” When the defendant’s mother was asked on cross examination where the defendant and his some of his friends used to hang out, she testified that she used to retrieve the defendant from Prieur and Columbus Streets because she knew he could be found there at a certain time.
The defendant correctly noted in his appellate brief that K.G. could not or would not directly state how she allegedly knew the defendant. However, the thrust of her testimony is that she knew who he was, what he looked like, and that he hung with Seventh Ward youths who used to feud with the Iberville project “Goonies” or “Goonie Boys,” as Detective Pratt referred to them.
The defendant does not mention a word about his alibi defense in arguing the suffi *664 ciency of the evidence. He and his mother and sister all testified that the defendant was home all day at his mother’s residence watching his four-month-old son, along with his sister.
Viewing all the evidence in a light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that the State negated any reasonable probability of misidentification and that the State proved beyond a reasonable doubt that the defendant killed the victim while having the specific intent to kill him or inflict great bodily harm upon him.
There is no merit to this assignment of error.
ASSIGNMENT OF ERROR NO. 2
|21In his second assignment of error, the defendant argues that the trial court abused its discretion in denying the defendant’s motion for mistrial, made after the prosecution adduced testimony that KG. was in a witness protection program.
The defendant complains of the following comments by Detective Pratt during redirect examination, made when the State was addressing issues raised by the defense in an attempt to discredit KG. The prosecutor asked Detective Pratt his view or impression of KG.’s demeanor when KG. telephoned him an hour after the killing to report the names of the two persons she had seen shoot at the victim. Over defense counsel’s objection that Detective Pratt could not tell KG.’s demean- or over the telephone, which the trial court overruled, Detective Pratt answered:
Q[sic] She was very historical [sic] and very scared. And she was emotionally crying. So I wouldn’t elect for her at any point at that time to see her and to conduct an interview.
Q Have you been working with Miss K.G. since this happened in May?
A Excuse me?
Q Have any contact with her since this happened in May?
A The only [sic] was witness protection, making sure that she’s safe from the other members of the gang that’s still out there right now.
Q So she was put in witness protection?
A Yes, she was.
Q Thank you.
At that point defense counsel asked to approach the bench and, after the jury was excused, he moved for a mistrial on the ground that Detective Pratt’s response was improper under La. C.E. art. 404(B)— impermissible reference to another | lacrime, wrong, or act by the defendant. The defendant also argued that the statement was “totally excludable” as prejudicial.
The trial court noted that a mistrial was a drastic remedy, and that there had been discussion during the trial of “organizations, community groups; i.e., gangs,.... ” The trial court further noted that there had been evidence introduced that other people had been identified as involved in the crime. Ultimately, the trial court said it did not believe the comment caused the defendant substantial prejudice such that he was deprived of his right to a fair trial, and consequently it denied the defendant’s motion for a mistrial. The defense counsel did not request an admonition to the jury.
On appeal, the defendant argues that the trial court erred in denying his motion for mistrial under La.C.Cr.P. art. 771, which states:
In the following cases, upon the request of the defendant or the state, the court shall promptly admonish the jury to disregard a remark or comment made during the trial, or in argument within the hearing of the jury, when the re *665 mark is irrelevant or immaterial and of such a nature that it might create prejudice against the defendant, or the state, in the mind of the jury:
(1) When the remark or comment is made by the judge, the district attorney, or a court official, and the remark is not within the scope of Article 770; or
(2) When the remark or comment is made by a witness or person other than the judge, district attorney, or a court official, regardless of whether the remark or comment is within the scope of Article 770.
In such cases, on motion of the defendant, the court may grant a mistrial if it is satisfied that an admonition is not sufficient to assure the defendant a fair trial.
La.C.Cr.P. art. 770(1) provides for a mandatory mistrial when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to another 123crime committed or alleged to have been committed by the defendant as to which evidence is not admissible. Given that the comment at issue was not a reference to another crime committed or alleged to have been committed by the defendant, a mistrial was not mandated under La. C.Cr.P. art. 770.
In addition to the mistrial provisions of La.C.Cr.P. arts. 770 and 771, La.C.Cr.P. art. 775 provides for mistrials, and states, in pertinent part that “[u]pon motion of a defendant, a mistrial shall be ordered, and in a jury case the jury dismissed, when prejudicial conduct in or outside the courtroom makes it impossible for the defendant to obtain a fair trial, or when authorized by Article 770 or 771.”
 “As a general matter, mistrial is a drastic remedy which should only be declared upon a clear showing of prejudice by the defendant.” State v. Leonard, 2005-1382, p. 11 (La.6/16/06), 982 So.2d 660, 667, citing State v. Wilkerson, 403 So.2d 652, 659 (La.1981)(mere possibility of prejudice is not enough to warrant mistrial). In addition, a trial court has broad discretion in determining whether conduct is so prejudicial as to deprive an accused of a fair trial. Leonard, supra.
Defendant cites two decisions in addressing this assignment of error, both of which were cited by the trial court in denying the motion for mistrial, State v. Ortiz, 96-1609 (La.10/21/97), 701 So.2d 922 and State v. Taylor, 91-2496 (La.App. 4 Cir. 3/29/94), 635 So.2d 416.
In Ortiz, the trial court denied the defendant’s motion for mistrial after a State witness (who received questions through an interpreter) inadvertently testified that one night he had stayed at a hotel because “they” said from jail that they were going to send someone to kill him. In response to a motion for mistrial, the trial court admonished the jury that the comment was improper and that it |24should not consider it as part of the evidence. The trial court also instructed the interpreter to instruct the witness that he should be directly responsive to the questions and should not tell the jury what others not parties to the case told him. On appeal, the Louisiana Supreme Court noted that defense counsel had said in his opening statement that the particular witness would testify that he had asked to be placed in the FBI witness protection program because he was worried about the defendant killing him. The court thus characterized the non-responsive remark of the witness as a “less prejudicial version of testimony predicted by the defense in opening statement.” Ortiz, 96-1609, p. 12, 701 So.2d at 930. In light of this fact, as well as the trial court’s admonishment to *666 the jury, the court found that the trial court had not abused its discretion in denying the motion for mistrial.
In Taylor, after a State witness had concluded her testimony and defense counsel had asked that she be placed under subpoena, the prosecutor asked to approach the bench, whereupon he stated that the witness was under witness protection. The defense counsel objected and moved for a mistrial, which was denied. On review of the denial of the motion for mistrial, this Court noted that it appeared the comment was not made within the hearing of the jury and that even if it had been, there was no evidence it caused substantial prejudice to the defendant depriving him of a fair trial. This Court noted that the defendant in the second degree murder prosecution had confessed in writing to shooting the victim, and eyewitnesses had corroborated that the defendant had shot the victim.
The defendant asserts that the facts of the instant case are easily distinguishable from those in both Ortiz and Taylor. He argues that because the only evidence linking him to the crime was a “very questionable eyewitness | ^identification,” the admission of the testimony regarding eyewitness protection was not only improper but was highly prejudicial.
We note that during her direct testimony K.G. herself referred to being in protective custody, after detailing her identifications of the defendants in the photo lineups presented to her by Detective Pratt. K.G. stated, and the following colloquy transpired:
A We went over a few little questions about what happened and who it was. And after that, I met that Tuesday at 7 p.m. I did a photo point out and I identified the suspects. And this was at seven o’clock p.m, [sic] Tuesday. And then after that, I went in custody.
Q Why did you go into custody?
A Because I fell it’s — I’m not scared, I’m just in fear' and this got to be stopped. This something I seen, nobody done tell me nothing. I was there. They had babies out there. And I’m here for my life and I’m here for to tell the truth and nothing but the truth.
The defendant lodged no objection to this testimony by K.G. or to the question posed by the prosecutor about her going into custody.
Thus, the later testimony by Detective Pratt — although less ambiguous insofar as he and the prosecutor both used the term “witness protection” — was, to a significant degree, cumulative to this earlier testimony by K.G. that she was coming forward because this type of activity (the gunning down of Rodrick Gordon) had to be stopped, but that she had gone into custody because she was fearful.
The sufficiency of the evidence has already been discussed. K.G. was a strong eyewitness, and the trial court was correct that several other persons were involved in the shooting incident. The jury knew that the defendant had a tattoo on his face heralding his association with the Seventh Ward, and that his mother used to get him from a street corner for which a Seventh Ward association or gang was l^named— the Prieur and Columbus Boys. Considering the totality of the facts and circumstances, it cannot be said that the trial court abused its discretion in finding that the defendant failed to make a clear showing of prejudice as a result of Detective Pratt testifying that K.G. was put in the witness protection program, and thus in consequently denying the defendant’s motion for mistrial.
There is no merit to this assignment of error.
*667 ASSIGNMENT OF ERROR NO. 3
In his third assignment of error, the defendant argues that his trial counsel was ineffective in failing to file a motion in limine or object to the admission of photographs from the defendant’s My Space page depicting him holding weapons unrelated to those used in the shooting.
The defendant’s appellate counsel refers to two photos from the defendant’s My Space webpage which were “described by the prosecution” as follows — “one photograph depicts the defendant standing alone holding a sawed off shotgun. The other photograph shows the defendant posing holding two guns.”
The record contains copies of two exhibits depicting individuals holding firearms. State Exhibit 11 is a single photograph depicting the defendant holding two semiautomatic pistols along with another individual who is holding a sawed-off shotgun. That photograph is the only one depicting anyone holding a sawed-off shotgun. State Exhibit 11 was first introduced by the State immediately after the prosecutor asked the defendant’s mother, Della Burke, with whom the defendant allegedly resided, whether the defendant had “anything to do with guns.” Ms. Burke replied, “[n]ot that I’m aware of.” At that precise point the State asked Ms. Burke to view State Exhibit 11 which, she confirmed, depicted the defendant holding two guns, one in each hand. The prosecutor asked her if the defendant was 127with another individual in the photo, and she replied in the affirmative. She was asked what kind of weapon the other individual was holding, and she replied that it looked like a sawed-off shotgun.
The defendant’s argument on appeal is limited to an alleged photo of him holding a sawed-off shotgun and one of him holding two handguns. No photo introduced in evidence, or described by the prosecutor, depicted the defendant holding a sawed-off shotgun. Nor was there any single photo of the defendant holding two guns. State Exhibit 11 is the photograph of which the defendant complains, given that it is the only photo depicting him holding two handguns.
This Court set forth the applicable jurisprudence on ineffective assistance of counsel in State v. Rubens, 2010-1114, pp. 58-59 (La.App. 4 Cir. 11/30/11), 83 So.3d 30, 66-67, writ denied, 2012-0374 (La.5/25/12), 90 So.3d 410, as follows:
“As a general rule, claims of ineffective assistance of counsel are more properly raised by application for post-conviction relief in the trial court where a full evidentiary hearing may be conducted if warranted.” State v. Howard, 98-0064, p. 15 (La.4/23/99), 751 So.2d 783, 802. However, where the record is sufficient, the claims may be addressed on appeal. State v. Bordes, 98-0086, p. 7 (La.App. 4 Cir. 6/16/99), 738 So.2d 143, 147. Ineffective assistance of counsel claims are reviewed under the two-part test of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). State v. Brooks, 94-2438, p. 6 (La.10/16/95), 661 So.2d 1333, 1337 (on rehearing); State v. Robinson, 98-1606, p. 10 (La.App. 4 Cir. 8/11/99), 744 So.2d 119, 126. In order to prevail, the defendant must show both that: (1) counsel’s performance was deficient; and (2) he was prejudiced by the deficiency. Brooks, supra; State v. Jackson, 97-2220, p. 8 (La.App. 4 Cir. 5/12/99), 733 So.2d 736, 741. Counsel’s performance is ineffective when it is shown that he made errors so serious that counsel was not functioning as the “counsel” guaranteed by the Sixth Amendment. Strickland, 466 U.S. at 686, 104 S.Ct. at 2064; State v. Ash, p. 9 (La.App. 4 Cir. 2/10/99), 729 So.2d 664, 669. Counsel’s *668 deficient performance will have prejudiced the defendant if he shows that the errors were so serious as to deprive him of a fair trial. To carry his burden, the defendant must show that there is a reasonable probability that, but for counsel’s deficient performance the result of the proceeding would have been different; “[a] reasonable probability is a probability sufficient to undermine confidence in the outcome.” Strickland, 466 U.S. at 693, 104 S.Ct. at 2068; State v. Guy, 97-1387, p. 7 (La.App. 4 Cir. 5/19/99), 737 So.2d 231, 236.
| asThis court has previously recognized that if an alleged error falls “within the ambit of trial strategy” it does not “establish ineffective assistance of counsel.” Bordes, 98-0086, p. 8, 738 So.2d at 147, quoting State v. Bienemy, 483 So.2d 1105, 1107 (La.App. 4 Cir.1986). Moreover, as “opinions may differ on the advisability of a tactic, hindsight is not the proper perspective for judging the competence of counsel’s trial decisions. Neither may an attorney’s level of representation be determined by whether a particular strategy is successful.” Id. quoting State v. Brooks, 505 So.2d 714, 724 (La.1987).
The first time the State presented State Exhibit 11 at trial was during its cross examination of the defendant’s mother, Ms. Burke. During her cross examination, immediately after the prosecutor stated, “I’m showing what I’m marking for identification as S — 11,” the defendant’s trial counsel interjected, “Approach?” Immediately thereafter the trial transcript reflects: “(AT THIS TIME A BRIEF UNRECORDED SIDEBAR IS HELD).” Thereafter, cross examination resumed with the State first asking the defendant’s mother if he belonged to any gang or association and then following that question up by asking her if he had anything to do with guns. The next question was about State Exhibit 11, the photograph depicting the defendant holding two handguns.
The defendant does not mention in his appellate brief this timely request by the defendant’s trial counsel to approach the bench upon the State marking the State Exhibit 11 for introduction into evidence or the ensuing unrecorded sidebar conference.
The record is lacking any motion in limine with regard to State Exhibit 11. However, the record suggests that, in fact, defense counsel did address the issue of State Exhibit 11 immediately prior to its use by the State. However, exactly what was discussed during the unrecorded sidebar conference is unknown.
129State Exhibit 11, the photograph of the defendant holding two handguns, was relevant as tending to impeach the testimony by his mother — with whom the defendant allegedly resided — that she did not know of the defendant having anything to do with guns. Moreover, during his own testimony the defendant effectively disavowed owning those guns or having any guns at all. The photo tended to impeach the defendant’s testimony with regard to his denial of any association with, or ownership of or possession of guns — except for his admission that he posed for the photo and posted it on his My Space webpage.
The defendant fails to address on appeal the relevancy of State Exhibit 11 insofar as his mother’s testimony that she was unaware of the defendant having anything to do with guns and/or his own disavowal of any relationship to/with guns besides having posed with those two for the photograph. The defendant does not even mention that testimony by his mother and/or himself in his appellate brief, maintaining *669 simply that the photo “had absolutely no relevance to the instant case.”
More importantly, the defendant fails to acknowledge his trial counsel’s request to approach at the moment the State marked State Exhibit 11 for introduction and the ensuing unrecorded sidebar conference.
The defendant failed to establish that counsel’s performance was deficient, or that, even assuming it was deficient, that he established that there is a reasonable probability that, but for counsel’s deficient performance, the result of the proceeding would have been different.
This assignment of error is without merit.
ASSIGNMENT OF ERROR NO. 4
In his fourth assignment of error, the defendant argues that he was deprived of his right to confrontation guaranteed him by the Sixth Amendment and La. |c,nConst. art. 1, § 16 by Detective Pratt testifying to the “substance” of a testimonial statement allegedly made to the detective by one of the defendant’s codefendants, and that his trial counsel was ineffective in failing to object, ask for an admonition, or move for a mistrial.
In Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the Court held that the admission of “testimonial” hearsay evidence violates the Sixth Amendment’s Confrontation Clause. The hearsay the Court found testimonial was a recorded statement given by the defendant’s wife to police after she had been advised of her Miranda[5] rights. The statement was introduced by the State to rebut the defendant’s claim of self-defense in a stabbing case in which he was charged with assault and attempted murder. The defendant and his wife were each interrogated twice by police. The wife did not testify because of the state marital privilege, and the defendant had no other opportunity to cross examine her. The Court in Crawford left “for another day any effort to spell out a comprehensive definition of ‘testimonial,’ ” but stated that “[wjhatever else the term covers, it applies at a minimum to ... police interrogations.” 541 U.S. at 68,124 S.Ct. at 1374.
The Court stated in Crawford that “even if the Sixth Amendment is not solely concerned with testimonial hearsay, that is its primary object, and interrogations by law enforcement officer fall squarely within that class.” 541 U.S. at 53, 124 S.Ct. at 1365. The Court noted in a footnote to that statement that it used the term “interrogation” in its colloquial, rather than any technical legal, |S1 sense, and that, as with the term “testimonial,” one could “imagine various definitions of interrogation.’” Id.
In Davis v. Washington, 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006), the Court had to determine whether a recording of a 911 call from a victim of domestic violence was testimonial within the meaning of Crawford. The 911 operator first asked the caller what was going on, to which the caller responded that “he [sic] here jumpin’ on me again.” 547 U.S. at 817, 126 S.Ct. at 2271. The 911 operator asked if there were any weapons, and the caller said “No. He’s [sic] usin’ his fists.” Id. The 911 operator asked the caller, in three successive questions, if she knew, first, the perpetrator’s last name, second, his first name, and third, his middle initial. In response to each respective question the caller gave the operator the defendant’s last, first, and full middle names. The defendant was charged with, and convicted of, a felony violation of a domestic no-contact order. The only witnesses presented by the State were the two respond *670 ing police officers, who both testified that the victim exhibited injuries that appeared to be recent. However, neither officer could testify as to the cause of the injuries.
The issue in Davis was whether, “objectively considered, the interrogation that took place in the course of the 911 call produced testimonial statements” as contemplated by Crawford. 547 U.S. at 826, 126 S.Ct. at 2276. In its analysis in Davis, the Court noted that when it had stated in Crawford that interrogations by law enforcement fall squarely within the class of testimonial hearsay with which the Sixth Amendment was concerned, the Court “had immediately in mind (for that was the case before us) interrogations solely directed at establishing the facts of a past crime, in order to identify (or provide evidence to convict) the perpetrator. |32The product of such interrogation is testimonial.” Davis, 547 U.S. at 826, 126 S.Ct. at 2276.
In the instant ease, the objectionable testimony came from Detective Pratt as he was being cross examined by defense counsel as to why the detective had not recorded the statement given by the defendant. Detective Pratt said he did not record the defendant’s statement because, in his opinion, the defendant was lying. Detective Pratt subsequently said that the defendant gave inconsistent statements. The State objected at this point that it was irrelevant, given that any exculpatory statement by the defendant was hearsay and was not coming in as evidence through Detective Pratt. The objection was sustained, and defense counsel continued his cross examination, with the following colloquy occurring:
Q So it didn’t fit your story, so you chose not to record it?
A Not my story, the story of his partner.
Q I’m sorry.
A The story of his partner, Jamal. It didn’t fit with what he said, either. So, it was inconsistent and Jamal’s was inconsistent.
Detective Pratt did not testify to the substance of what Jamal “Mall” Clay said to police, other than to say it was inconsistent with what the defendant told him. Essentially, all Detective Pratt stated was that the statements of the defendant and Jamal Clay were mutually inconsistent, without testifying to the substance of either. The defendant cites no jurisprudence applying Crawford under such circumstances.
Even assuming, for the sake of argument, that Detective Pratt’s testimony constituted testimonial hearsay as contemplated by Crawford, confrontation errors are subject to the harmless error analysis; the verdict may stand if the reviewing liacourt determines that the guilty verdict rendered in the particular trial was surely unattributable to the error. Rubens, 2010-1114, p. 44, 83 So.3d at 59. Considering the detective’s testimony and the evidence as a whole, the guilty verdict rendered in the instant case was surely unattributable to that testimony.
As for trial counsel’s performance regarding the matter, the testimony by Detective Pratt did not prejudice the defendant to the extent that the drastic remedy of a mistrial would have been warranted under La.C.Cr.P. art. 775, providing that a mistrial may be declared when prejudicial conduct in or outside the courtroom makes it impossible for the defendant to obtain a fair trial. Thus, it cannot be said that trial counsel’s performance would have been deficient in not moving for a mistrial based on the comments. Further, trial counsel obviously chose the trial strategy of moving on from the topic, rather than objecting and requesting an admo *671 nition. That strategy cannot be said to have constituted deficient performance.
There is no merit to this assignment of error.
CONCLUSION
For the foregoing reasons, we affirm defendant’s conviction and sentence.
AFFIRMED

. The defendant was jointly indicted with four other individuals, Joseph Kemp, Jamal Clay, Quincy Jackson, and Dominick Grant, all of whom were still awaiting trial at the time the defendant Travis Burke was convicted in the instant case.

. The grand jury indictment spells the victim’s first name as "Rondrick.” However, at trial his mother testified that she was "Rodrick” Gordon’s mother, and his name is spelled as "Rodrick” throughout the trial transcript. Therefore, the victim's name will be referred to as "Rodrick.”

. "Mall” is a nickname for Jamal Clay.

. Custody refers to the witness protection program.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).