MADELEINE M. LANDRIEU, Judge.
_JjThe defendant, John E. Rivers, appeals his conviction of second degree murder and life sentence. For the reasons that follow, we affirm.

STATEMENT OF THE CASE

On February 27, 2013, the State charged Mr. Rivers by indictment with second degree murder, a violation of La. R.S. 14:30.1. Mr. Rivers pled not' guilty. Following a motion hearing, the trial court *1109 found probable cause and denied the defendant’s motion to suppress his statement.
The matter was tried to a jury on January 14-16, 2014. Mr. Rivers was found guilty as charged. He filed a motion for post-verdict judgment of acquittal and a motion for new trial. On February 5, 2014, the trial court denied the motions and sentenced Mr. Rivers to life in prison without benefit of probation, parole, or suspension of sentence. Mr. Rivers filed a motion to reconsider sentence, which was denied by the trial court. Mr. Rivers now appeals.

\ .FACTS

At 7:20 p.m., on January 8, 2013, Mr. Rivers telephoned Sgt. Kirk Usey of the Plaquemines Parish Sheriffs Office and told him he wanted to turn himself in to authorities because he had killed his girlfriend. Mr. Rivers knew Sgt. Usey because Mr. Rivers had worked for him as a handyman in the past. Thinking that Mr. Rivers might be lying, Sgt. Usey called Greg Hijuelos, a Commander with the Plaquemines Parish Sheriffs Office, who also knew Mr. Rivers. Sgt. Usey then called Mr. Rivers and got his permission for Cmdr. Hijuelos to contact him. Using Sgt. Usejfs phone, Cmdr. Hijuelos called Mr. Rivers and spoke with him. Mr. Rivers told Cmdr. Hijuelos that at around 2:00 p.m. that day, he had gotten into an argument with his girlfriend, which had ended with him stabbing her four times. Mr. Rivers said that he was about an hour away from the Belle Chasse lockup in Den-ham Springs, explaining that after killing his girlfriend, he had driven to Denham Spring to see his son. Mr. Rivers agreed to meet Cmdr. Hijuelos at the Belle Chasse lockup at around 9:00 p.m. Mr. Rivers also told Cmdr. Hijuelos where the killing had taken place and offered to take him there. Cmdr. Hijuelos responded that he and Sgt. Usey would go to the location while they were waiting for Mr. Rivers to arrive at the Belle Chasse lockup.
After speaking with Mr. Rivers on the phone, Cmdr. Hijuelos and Sgt. Usey proceeded to the area where Mr. Rivers had said his girlfriend’s body would be, and they found the body of Wendy Osborn down a small trail about 100 yards off Buccaneer Road.
| ¡¡Captain Mark Plumer arrived at the location at about 8:46 p.m., at which point Cmdr. Hijuelos and Sgt. Usey left to go meet with Mr. Rivers at the Belle Chasse lockup. At the lockup, one detective conducted a pat-down search of Mr. Rivers for weapons during which Mr. Rivers emptied his pockets, taking out a Smith and Wesson folding-type knife, a cell phone and his wallet. Mr. Rivers told the officers that the knife, which still had blood on it, was the one he had used to stab his girlfriend. Cmdr. Hijuelos transported Mr. Rivers from the lockup to the detective bureau so he could be interviewed.
Detective Aaron Verrette first informed Mr. Rivers of his constitutional rights and had him sign a Waiver of Rights form. Det. Verrette and another detective then conducted a custodial interrogation of Mr. Rivers, a tape of which was played for the jury. Mr. Rivers said that he and his girlfriend, Wendy Osborn, had been in an argument earlier in the day because he believed she had been stealing his Vicodin pills and money. They continued to argue off and on as they drove to an area off Buccaneer Road in Belle Chasse to have sex. Mr. Rivers said it had been was a regular part of their lives to have sex in various places, such as state parks, and that they had gone to that particular location in Belle Chasse two or three times in the past. Mr. Rivers said that, after he and Ms. Osborn arrived at the Belle Chasse location that day, they continued to *1110 argue about the pills, and, at some point, he “back-handed” her in the face, and she bit him on the finger. He then took out his knife and stabbed her once in the chest. According to Mr. Rivers, Ms. Osborn was slumped over after he initially stabbed her, but she was |4not dead. Mr. Rivers said he then got out of the vehicle, walked around the back to the other side and pulled Ms.. Osborn from the truck. He said Ms. Osborn was face up on the ground begging him not to do it when he sat on top of her and repeatedly stabbed her in the chest. Mr. Rivers said Ms. Osborn was still alive when he left her on the ground, got back into his vehicle and drove off. Although Mr. Rivers was repeatedly questioned as to why he and Ms. Osborn would leave a “perfectly good apartment” in Gretna and drive all the way down to Buccaneer Road to have sex, he maintained that doing so was normal for them, and insisted that he did not go out there to kill Ms. Osborn, telling the detectives that he felt “very bad” about what happened.
Dr. Susan Garcia, the Assistant Deputy Coroner for Jefferson Parish, performed the autopsy on Wendy Osborn. Dr. Garcia testified that Ms. Osborn had a total of seventeen wounds from a sharp instrument. The doctor stated that most of the wounds were clustered around Ms. Osborn’s chest, but that there also was one in her abdominal area and one on the back of her left hand. Dr. Garcia explained that the wounds to Ms. Osborn’s chest were the most significant. She stated that two of those wounds were lethal, one to the coronary artery and the other to the carotid artery. Dr. Garcia testified that Ms. Osborn bled to death.
Leslie Landry of the Louisiana State Police Crime Lab conducted the DNA analysis on the evidence in the case, which included the folding knife, a swab of blood from the center console of Mr. River’s SUV, and a swab of blood from the SUV’s back seat air conditioning vent. The blood from the center console | ^contained a mixture of two persons’ DNA, and Mr. Rivers could not be excluded as a donor of the DNA. Ms. Landry was not able to determine when the blood had been deposited at that location. She testified that the blood on the blade of the knife contained Ms. Osborn’s DNA.

ERRORS PATENT

A review of the record reveals no errors patent.

ASSIGNMENT OF ERROR

In his sole assignment of error, Mr. Rivers contends there was insufficient evidence to support his conviction for second degree murder, and a rational jury would have instead found him guilty of manslaughter.
Second degree murder is a violation of La. R.S. 14:80.1, which provides, in pertinent part:
A. Second degree murder is the killing of a human being:
(1) When the offender has a specific intent to kill or to inflict great bodily harm...
[[Image here]]
B. Whoever commits the crime of second degree murder shall be punished by life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence.
Mr. Rivers argues that he should have been convicted of manslaughter, a violation of La. R.S. 14:31, which provides, in pertinent part:
A. Manslaughter is:
(1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is *1111 committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the |ftjury finds that the offender’s blood had actually cooled, or that an average person’s blood would have cooled, at the time the offense was committed; or
(2) A homicide committed, without any intent to cause death or great bodily harm.
* * *
B. Whoever commits manslaughter shall be imprisoned at hard labor for not more than forty years....
The Louisiana Supreme Court has held that “heat of blood” and “sudden passion” are not elements of the offense of manslaughter; they are factors in the nature of mitigating circumstances which may reduce the grade of homicide. State v. Tompkins, 403 So.2d 644, 648 (La.1981).
To convict a defendant of second degree murder, the State must prove that defendant had the specific intent to kill or inflict great bodily harm. La. R.S. 14:10(1) defines specific intent as follows: “Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act.” Specific intent may be inferred from the circumstances and actions of the defendant. State v. Williams, 2005-0459, p. 14 (La.App. 4 Cir. 1/18/06), 925 So.2d 567, 575. Specific intent can be formed in an instant. State v. Cousan, 94-2508, p. 13 (La.11/25/96), 684 So.2d 382, 390; State v. McElveen, 2010-0172, p. 20 (La.App. 4 Cir. 9/28/11), 73 So.3d 1033, 1051. Specific intent to kill can be inferred from the intentional use of a deadly weapon. See, e.g.: State v. Byrd, 2012-0556, pp. 2-3 (La.6/5/13), 119 So.3d 801, 803; State v. Johnson, 2008-1488, p. 10 (La.App. 4 Cir. 2/10/10), 33 So.3d 328, 333.
Lin State v. Burke, 2011-1081 (La.App. 4 Cir. 10/31/12), 103 So.3d 652, this Court set forth the standard of review for sufficiency of the evidence:
In evaluating whether evidence is constitutionally sufficient to support a conviction, an appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Green, 588 So.2d 757 (La.App. 4 Cir.1991). However, the reviewing court may not disregard this duty simply because the record contains evidence that tends to support each fact necessary to constitute the crime. State v. Mussall, 523 So.2d 1305 (La.1988). The reviewing court must consider the record as a whole since that is what a rational trier of fact would do. If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier’s view of all the evidence most favorable to the prosecution must be adopted. The fact finder’s discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. Mussall; Green; supra. “[A] reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence.” State v. Smith, 600 So.2d 1319 (La.1992) at 1324.
In addition, when circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from *1112 which the existence of the main fact may be inferred according to reason and common experience. State v. Shapiro, 431 So.2d 372 (La.1982). The elements must be proven such that every reasonable hypothesis of innocence is excluded. La. R.S. 15:438. This is not a separate test from Jackson v. Virginia, supra, but rather an evidentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt. State v. Wright, 445 So.2d 1198 (La.1984). All evidence, direct and circumstantial, must meet the Jackson reasonable doubt standard. State v. Jacobs, 504 So.2d 817 (La.1987).
Burke, pp. 16-17, 103 So.3d at pp. 661-662 (quoting State v. Huckaby, 2000-1082, p. 32 (La.App. 4 Cir. 2/6/02), 809 So.2d 1093, 1111).
In the case before us, Mr. Rivers admitted that after stabbing Ms. Osborn once, he exited the vehicle, walked to the passenger side, removed the victim, got on top of her on the ground, stabbed her sixteen more times as she begged him not [Rto, and finally left her to die. Mr. Rivers also testified that he was not intoxicated either at the time of the murder or when he gave his confession. He contends on appeal, however, that he should have been convicted of manslaughter rather than of second degree murder because the victim bit him on the finger after he hit her in the face. Mr. Rivers argues that her biting him was sufficient provocation to deprive an average person of his cool reflection and self-control. In State v. Lombard, 486 So.2d 106 (La.1986), the Louisiana Supreme Court stated:
“[Sjudden passion” and “heat of blood” are not elements of the offense of manslaughter; rather, they are mitigatory factors in the nature of a defense which exhibit a degree of culpability less than that present when the homicide is committed without them. Since they are mitigatory factors, a defendant who establishes by a preponderance of the evidence that he acted in a “sudden passion” or “heat of blood” is entitled to a manslaughter verdict.
Id. at 110-ll(citations and footnotes omitted). See also, State ex rel. Lawrence v. Smith, 571 So.2d 133, 136 (La.1990).
Here, the jury was presented with a photograph of the bite wound that Mr. Rivers alleges provoked his attack. That photograph shows a minimal wound to Mr. Rivers’ finger. Viewing the evidence in the light most favorable to the prosecution, we conclude that a rational trier of fact could have found that Mr. Rivers failed to prove by a preponderance of the evidence that his killing of Ms. Osborn was triggered by “sudden passion” or “heat of blood” sufficient to deprive an average person of his cool reflection and self-control. Accordingly, the trial court did not err by convicting Mr. Rivers of second-degree murder.
| .¡CONCLUSION
For the reasons stated, we affirm Mr. Rivers’ conviction and sentence.
AFFIRMED
BONIN, J., concurs with additional reasons.